# IN THE SUPREME COURT OF IOWA

No. 19–1278

Submitted September 16, 2020—Filed December 31, 2020

**KRYSTAL WAGNER,** Individually and as Administrator of the Estate of Shane Jensen**,**

    Plaintiffs,

vs.

**STATE OF IOWA** and **WILLIAM L. SPECE** a/k/a BILL L. SPECE,

    Defendants.

---

Certified questions of law from the United States District Court for the Northern District of Iowa, C.J. Williams, United States District Court Judge.

A federal district court certified four questions of Iowa law in a wrongful death and loss of consortium case including damage claims under the Iowa Constitution. **CERTIFIED QUESTIONS ANSWERED.**

Mansfield, J., delivered the opinion of the court, in which Christensen, C.J., and Waterman, McDonald, Oxley, and McDermott, JJ., joined. Appel, J., filed a dissenting opinion.

David A. O'Brien (argued) of Dave O'Brien Law, Cedar Rapids, and Nathan Borland of Timmer & Judkins, P.L.L.C., West Des Moines, for plaintiffs.

Thomas J. Miller, Attorney General, Jeffrey S. Thompson, Solicitor General (argued), Jeffrey C. Peterzalek and Tessa M. Register, Assistant Attorneys General, for defendants.

**MANSFIELD, Justice.**

We have been asked to answer four certified questions of law in a federal case brought by a mother, individually and as the administrator of her son's estate, against the State of Iowa and a Department of Natural Resources (DNR) officer. The officer shot and killed the son during an armed standoff. At the time, the son was nineteen years old and suicidal.

The mother filed suit in federal court, alleging claims under the United States Constitution (via 42 U.S.C. § 1983) and the Iowa Constitution, as well as a common law negligence claim. The State and the DNR officer filed a motion to dismiss on various grounds, and the federal district court granted the motion in part. In particular, based on the Eleventh Amendment, the federal court dismissed without prejudice all claims against the State. On the same ground, it dismissed all claims against the DNR officer in his official capacity. The federal court also found as a matter of law that the DNR officer was acting within the scope of his employment when he shot and killed the young man. It dismissed without prejudice the mother's negligence claims for failure to exhaust administrative remedies under the Iowa Tort Claims Act. The federal court refused to dismiss the claims under the United States Constitution and 42 U.S.C. § 1983 against the DNR officer in his individual capacity.

After explaining these rulings, the court certified the following questions to us:

> [1]. Does the Iowa Tort Claims Act, Iowa Code Chapter 669, apply to plaintiffs' [state] constitutional tort causes of action?

> [2]. Is the available remedy under the Iowa Tort Claims Act for excessive force by a law enforcement officer inadequate based on the unavailability of punitive damages? And if not, what considerations should courts address in determining whether legislative remedies for excessive force are adequate?

[3]. Are plaintiffs' claims under the Iowa Constitution subject to the administrative exhaustion requirement in Iowa Code section 669.5(1)?

[4]. Are plaintiffs required to bring their Iowa constitutional claims in the appropriate Iowa district court under Iowa Code section 669.4?

In answering these questions, we are guided by the principle that the legislature has the right to regulate claims against the State and state officials, including damage claims under the Iowa Constitution, so long as it does not deny an adequate remedy to the plaintiff for constitutional violations. We also conclude that the legislature intended the Iowa Tort Claims Act to serve as the gateway for all tort litigation against the State. Therefore, we answer the questions as follows:

1. Yes, as to the procedural requirements of that Act.

2. No.

3. Yes.

4. Yes.

## I. Background Facts and Proceedings.

"When we answer a certified question, we rely upon the facts provided with the certified question." *Baldwin v. City of Estherville (Baldwin I)*, 915 N.W.2d 259, 261 (Iowa 2018). Here, the federal district court adopted plaintiffs' complaint as the statement of facts for purposes of the certified questions only.

According to the complaint, Shane Jensen, the son of plaintiff Krystal Wagner, was nineteen years old on Saturday, November 11, 2017. He suffered from numerous mental health issues and was understood to be suicidal. He had just broken up with his girlfriend on November 9 and destroyed some of her property. A warrant was issued for Jensen's arrest that day. On November 10, Jensen obtained a handgun at a relative's home.

On Saturday, November 11, a Humboldt police officer and three Humboldt County deputy sheriffs encountered Jensen hiding under a deck at a friend's home. He was ordered to come out. Although Jensen emerged pointing his gun at the police officer, the officer did not shoot because he was aware of Jensen's condition. Instead, the officer retreated to cover. Likewise, the sheriff's deputies understood Jensen's condition and did not fire their weapons.

After emerging, Jensen stood in an open area and pointed his gun to his own head. Jensen then fired a single shot into the air above his own head. He yelled words to the effect that the officers were going to have to kill him. However, Jensen never pointed his gun at any of the officers.

In addition to local law enforcement, a DNR officer named William Spece was present, having assisted in the search for Jensen. Officer Spece had been made aware of Jensen's condition. However, unlike the other officers, Officer Spece did not hold his fire. Instead, Officer Spece fired a single round from his rifle at Jensen. Officer Spece claimed that Jensen was training his weapon on the officers, but a video of the incident showed that was not true. In any event, the bullet from Officer Spece's rifle struck Jensen in the chest and killed him.

On February 13, 2019, Wagner filed a complaint in the United States District Court for the Northern District of Iowa, bringing claims both individually and as the administrator of Jensen's estate. She alleged that Officer Spece had used excessive and unjustified force, that he lacked sufficient training, that he had failed to follow protocols, and that he "failed to appropriately heed the warning he was given that Jensen was suicidal and may be seeking to commit suicide by cop." Wagner named as defendants the State, Officer Spece in an official capacity, and Officer Spece in an individual capacity.

Wagner's claims included excessive force in violation of the Fourth Amendment of the United States Constitution and article I, section 8 of the Iowa Constitution (count I); denial of substantive due process in violation of the Fourteenth Amendment of the United States Constitution and article I, section 9 of the Iowa Constitution (count II); wrongful hiring and failure to train in violation of the Fourth Amendment of the United States Constitution and article I, section 8 of the Iowa Constitution (count III); wrongful death—common law negligence (count IV); and loss of consortium (count V).[1]

The defendants filed a motion to dismiss. Following a hearing, the federal district court dismissed all claims against the State. In so doing, the court relied on the State's Eleventh Amendment immunity, which prevents it from being sued in federal court without its consent or a valid congressional override. The court also dismissed on the same ground all claims against Officer Spece in his official capacity. *See Kentucky v. Graham*, 473 U.S. 159, 169, 105 S. Ct. 3099, 3107 (1985) ("The Court has held that, absent waiver by the State or valid congressional override, the Eleventh Amendment bars a damages action against a State in federal court. This bar remains in effect when State officials are sued for damages in their official capacity." (citation omitted)).

The court denied the motion to dismiss Wagner's federal constitutional claims to the extent they were brought against Officer Spece in his individual capacity. Thus, count I and count II could go forward against Officer Spece individually under 42 U.S.C. § 1983 and the United

---

[1]In *Godfrey v. State* (*Godfrey II*), 898 N.W.2d 844 (Iowa 2017), we recognized the existence of tort claims under the Iowa Constitution when the legislature has not provided an adequate remedy. *Id.* at 845 (plurality opinion), 880 (Cady, C.J., concurring in part and dissenting in part). We shall refer to them at points in this opinion as "*Godfrey* claims."

States Constitution. *See Hafer v. Melo*, 502 U.S. 21, 31, 112 S. Ct. 358, 365 (1991) ("We hold that state officials, sued in their individual capacities, are 'persons' within the meaning of § 1983. The Eleventh Amendment does not bar such suits . . . .").[2]

The court also dismissed without prejudice Wagner's state common law claims against Officer Spece, finding they fell entirely within the Iowa Tort Claims Act (ITCA), whose administrative process Wagner had not exhausted. In particular, the court determined as a matter of law that "Officer Spece was acting within the scope of his employment for purposes of the ITCA." This had the effect of sweeping all of Wagner's common law claims within the coverage of the ITCA. *See* Iowa Code § 669.5(1) (2019). Because Wagner had not previously invoked the ITCA's administrative process, the common law claims set forth in count IV were dismissed without prejudice as to Officer Spece.

This left the claims under the Iowa Constitution against Officer Spece in his individual capacity. In this regard, the court certified four questions of law to our court, as set forth in the introduction to this opinion.

## II. Should We Answer the Certified Questions?

Iowa law provides,

> The supreme court may answer questions of law certified to it by the supreme court of the United States, a court of appeals of the United States, a United States district court or the highest appellate court or the intermediate appellate court of another state, when requested by the certifying court, if there are involved in a proceeding before it questions of law of this state which may be determinative of the cause then pending in the certifying court and as to which

---

[2]The constitutional claims in Count III involved alleged wrongful hiring and training *of* Officer Spece, and thus were not asserted against Officer Spece in his official or individual capacity.

it appears to the certifying court there is no controlling precedent in the decisions of the appellate courts of this state.

Iowa Code § 684A.1. Accordingly, we have held,

> It is within our discretion to answer certified questions from a United States district court. We may answer a question certified to us when (1) a proper court certified the question, (2) the question involves a matter of Iowa law, (3) the question "may be determinative of the cause . . . pending in the certifying court," and (4) it appears to the certifying court that there is no controlling Iowa precedent.

*Baldwin I*, 915 N.W.2d at 265 (quoting *Roth v. Evangelical Lutheran Good Samaritan Soc'y*, 886 N.W.2d 601, 605 (Iowa 2016)).

The parties dispute whether the third criterion has been met. The only claims currently pending in the federal litigation have been asserted against Officer Spece in his individual capacity. The claims under the Iowa Constitution against the State and Officer Spece in his official capacity have been dismissed without prejudice. As Officer Spece notes, we have so far recognized a direct claim under the Iowa Constitution only against a government entity or a government official who is sued in their *official* capacity. *See Baldwin I*, 915 N.W.2d at 265 ("Last year, in *Godfrey* [*v. State* (*Godfrey II*), 898 N.W.2d 844 (Iowa 2017)], we held that the State of Iowa and state officials acting in their official capacities could be sued directly for violating article I, section 6 (the Iowa equal protection clause) and article I, section 9 (the Iowa due process clause), where state law does not provide an adequate compensatory damage remedy."); *see also Venckus v. City of Iowa City*, 930 N.W.2d 792, 799 n.1 (Iowa 2019) ("In *Godfrey* [*II*], this court held the State of Iowa and state officials acting in their official capacities could be sued directly for violations of the equal protection and due process clauses of the Iowa Constitution but only where state law does not otherwise provide an adequate damage remedy."); *Baldwin v. City of Estherville* (*Baldwin II*), 929 N.W.2d 691, 696 (Iowa 2019)

("We recognized that a direct cause of action for damages resulting from an Iowa constitutional tort could be brought against the state and state officials in their official capacities in the recent case of *Godfrey* [*II*]."). We have never recognized a *Godfrey* claim against a government official in their individual capacity. Accordingly, the defendants argue that the only remaining state constitutional claims are not viable, obviating any need for us to answer the certified questions.

Without citing any authority, Wagner responds that direct constitutional claims in Iowa can be brought against public officials acting in their individual capacity *in addition to* their official capacity. Alternatively, Wagner urges that the claims against the State and Officer Spece in his official capacity could potentially be reinstated based on how we answer the certified questions.

Wagner's second contention is incorrect. The Eleventh Amendment will not allow the federal court to entertain Wagner's claims against the State and Officer Spece acting in his official capacity regardless of how we answer the certified questions. *See Graham*, 473 U.S. at 169, 105 S. Ct. at 3107. However, Wagner's first contention merits greater attention.

Under federal precedent, state and local officials may be sued in their personal capacity under 42 U.S.C. § 1983 for actions undertaken in their official roles that violate the United States Constitution. *See Hafer*, 502 U.S. at 27, 112 S. Ct. at 362. *If* we adopted the same legal fiction in Iowa, that is, if we allowed *Godfrey* claims to be pursued against state officials in their individual capacity, then the answers to the certified questions would matter. To be precise, if our certified answers indicated that the ITCA does not apply to Wagner's *Godfrey* claims, there would be a path forward in federal court for Wagner's individual-capacity *Godfrey* claims (assuming such claims were permissible).

Under these circumstances, we believe the better course of action is to answer the certified questions. For if we did not answer these questions, we would have to answer a *different* question—namely, whether individual capacity *Godfrey* claims are available. If we decided individual capacity claims were not available, and therefore declined to answer the certified questions, those questions would still need to be answered at some point. In fact, assuming Wagner refiled her Iowa constitutional claims in our courts, we might see them down the road in the state-court version of this litigation.

Furthermore, the answers to the certified questions may dictate the answer to the individual-capacity question. Under the ITCA, state officials who were acting within the scope of their office or employment may only be sued in the name of the State, i.e., in their official capacity. ITCA coverage ordinarily leads to Eleventh Amendment immunity in federal court. In that sense, the answers to the certified questions may be the dog that wags the individual-capacity question tail. For these reasons, we proceed to answer the certified questions.

### III. Does the Iowa Tort Claims Act, Iowa Code Chapter 669, Apply to Plaintiffs' Constitutional Tort Causes of Action?

The first question is whether the ITCA applies to Wagner's constitutional tort causes of action. For the reasons discussed herein, we conclude that the ITCA's procedures apply to her claims.

**A. Recent Caselaw on Damages Claims Under the Iowa Constitution.** We begin by summarizing briefly our recent caselaw on direct constitutional claims for damages. In 2017, in *Godfrey II*, our court ruled that direct claims could be brought under the Iowa Constitution without legislative authorization. 898 N.W.2d at 847 (plurality opinion), 880 (Cady, C.J., concurring in part and dissenting in part). *Godfrey II* did

not have a majority opinion. Casting the deciding vote, a concurrence in part made clear that the court should imply damage remedies under the Iowa Constitution only when the legislative remedies were inadequate. *Id.* at 880 (Cady, C.J., concurring in part and dissenting in part). The concurrence in part joined the plurality opinion "to the extent it would recognize a tort claim under the Iowa Constitution when the legislature has not provided an adequate remedy." *Id.* The concurrence in part went on to find that the Iowa Civil Rights Act (ICRA) provided adequate remedies for Godfrey's claims of discrimination based on sexual orientation, and therefore those remedies were exclusive. *Id.* at 880–81.

Apart from recognizing the existence of a direct constitutional claim for damages, *Godfrey II* "express[ed] no view on other potential defenses which may be available to the defendants." *Id.* at 880 (plurality opinion). *Godfrey II*, as already noted, involved claims against the State and state employees acting in their official capacity. *See also id.* at 845–46, 893–94 (Mansfield, J., dissenting).

The following term, the *Baldwin* case came before us for the first time. *Baldwin I*, 915 N.W.2d 259. *Baldwin* was a federal court proceeding against a city and city officials where we were called upon to answer certified questions. *Id.* at 260. In 2018, in *Baldwin I*, we addressed whether a qualified immunity defense was available for a direct constitutional claim under article I, section 8 of the Iowa Constitution. *Id.* at 260–61. We declined to strictly follow the immunities in the Iowa Municipal Tort Claims Act (IMTCA)—or for that matter the ITCA. *Id.* As we explained, "The problem with these acts . . . is that they contain a grab bag of immunities reflecting certain *legislative* priorities. Some of those are unsuitable for *constitutional* torts." *Id.* at 280. Instead, we determined that an official who had exercised "all due care" should not be liable for

damages, a standard that bears resemblance to *one* of the immunities set forth in the ITCA and the IMTCA. *Id.* at 279–80 (citing Iowa Code §§ 669.14(1), 670.4(1)(*c*)). *Baldwin I* expressly left open whether other provisions of the ITCA and the IMTCA would apply to constitutional tort claims against public officials and public agencies. *Id.* at 281.

In 2019, in *Baldwin II*, we answered that open question as to the IMTCA. 929 N.W.2d 691. We held that the IMTCA generally governs constitutional tort damage claims against municipalities and municipal employees acting in their official capacities. *Id.* at 697–99 (quoting Iowa Code § 670.1(4)). Summing up, we said that "the IMTCA applies to Baldwin's Iowa constitutional tort causes of action." *Id.* at 698. Accordingly, we found that punitive damages and attorney fees could not be awarded against a municipality because the IMTCA did not allow such awards. *Id.* at 699–700. A partial dissent disagreed, arguing "it is critical that punitive damages be available against a government entity in a proper case in order to provide an adequate remedy to the state constitutional tort." *Id.* at 703 (Appel, J., concurring in part and dissenting in part).

Just a few weeks later in *Venckus*, another 2019 case involving claims against municipalities and municipal officials, we reiterated that "[c]laims arising under the state constitution are subject to the IMTCA." 930 N.W.2d at 808. Applying the IMTCA, we held in *Venckus* that the two-year statute of limitations in Iowa Code section 670.5 governed constitutional tort actions against a municipality and its employees acting in their official capacity. *Id.* at 809.

**B. Relevant Language in the ITCA.** The ITCA and the IMTCA are worded somewhat differently. The IMTCA by its terms applies to "actions based upon . . . denial or impairment of any right under any constitutional provision." Iowa Code § 670.1(4). The ITCA, by contrast, does not

expressly cover "constitutional" tort claims. *See id.* § 669.3.[3] In addition, the ITCA, unlike the IMTCA, excludes claims for assault or battery. *See id.* §§ 669.14(4), .23; *Thomas v. Gavin*, 838 N.W.2d 518, 522 (Iowa 2013) ("[T]here is no counterpart in section 670.4 to the ITCA's exception for claims based on assault, battery, false arrest, or malicious prosecution."). It should be remembered, of course, that neither the ITCA nor the IMTCA itself creates a cause of action. *Venckus*, 930 N.W.2d at 809; *Rivera v. Woodward Res. Ctr.*, 830 N.W.2d 724, 727 (Iowa 2013); *Minor v. State*, 819 N.W.2d 383, 405 (Iowa 2012).

Even though the ITCA does not specifically mention constitutional torts, it applies to:

> *b.* Any claim against an employee of the state for money only, . . . on account of personal injury or death, caused by the negligent or wrongful act or omission of any employee of

---

[3]The dissent suggests that this difference in language implies a conscious decision by the legislature, when it amended the IMTCA but not the ITCA in 1974, to allow constitutional tort claims against the State to proceed outside the ITCA. *See* 1974 Iowa Acts ch. 1263, § 2 (now codified at Iowa Code § 670.1(4)). An "exit ramp" so to speak. But this disregards several points. First, and most importantly, the established view in 1974 was that the State was immune from constitutional tort claims. As we discuss herein in the main text, there was no pre-*Godfrey* precedent allowing a direct constitutional claim for damages against the State or a state official. *Godfrey II* cites none and the dissent today cites none. As the main text explains, there was precedent against such claims.

Municipal tort claims have always stood on a somewhat different footing from tort claims against the State. As discussed in *Boyer v. Iowa High School Athletic Association*, even before the IMTCA came along, there were some situations where municipalities could be sued. 256 Iowa 337, 340–41, 127 N.W.2d 606, 608 (1964). The concept was governmental immunity, not sovereign immunity. *See id.* Thus, in the 1974 amendment, and continuing to this day, the legislature has given a wider berth for claims against municipalities than claims against the State. Accordingly, the IMTCA contains, on the whole, a broader definition of "claim" and fewer exemptions. *Compare* Iowa Code §§ 670.1(4), .4, *with* §§ 669.2(3), .14.

Another significant point overlooked by the dissent is that the legislature amended the ITCA the following year to require the State to indemnify and hold harmless state employees when sued for *federal* constitutional violations while acting within the scope of their employment. *See* 1975 Iowa Acts ch. 80, § 7 (now codified at Iowa Code § 669.22). If the legislature had any notion that such employees could be sued for *state* constitutional violations, why would it have not provided for that indemnification as well?

the state while acting within the scope of the employee's office or employment.

Iowa Code § 669.2(3)(*b*). Wagner's claims against *Officer Spece* clearly involve alleged "wrongful act[s] or omission[s] of any employee of the state while acting within the scope of the employee's office or employment." *Id.* The federal district court so found in its certification order. So it would seem that any claim against Officer Spece under the Iowa Constitution would be literally covered by the ITCA unless it falls under the exception for assault and battery claims. *See* Iowa Code §§ 669.14(4), .23.

Indeed, as observed by the federal district court in this case, there is an on-point federal precedent holding that direct claims under the Iowa Constitution against state employees come under the ITCA. *McCabe v. Macaulay*, 551 F. Supp. 2d 771, 785 (N.D. Iowa 2007). In *McCabe v. Macaulay*, a federal district court predicted (accurately, as it turned out) that our court would recognize a direct cause of action for violations of the Iowa Constitution. *Id.* However, based on the relevant language in Iowa Code section 669.2, the court then found that the claims were covered by the ITCA and the plaintiffs had to proceed under that statute. *Id.* at 786. As the court explained,

> Plaintiffs' state constitutional claims are "claims" under the ITCA: Troopers Bailey and Busch are state employees, Plaintiffs seek monetary damages for personal injury caused by the wrongful acts of Troopers Bailey and Busch and Troopers Bailey and Busch were acting within the scope of their employment. Therefore, Plaintiffs are required to exhaust their remedies under the ITCA.

*Id.* (citation omitted).[4]

---

[4]Iowa Code section 669.21 confirms that constitutional tort claims against state employees fall within section 669.2(3)(*b*). Section 669.21 provides that the State shall defend and indemnify any employee against "any claim as defined in section 669.2, subsection 3, paragraph 'b,' *including* claims arising under the Constitution, statutes, or rules of the United States or of any state." Iowa Code § 669.2(1) (emphasis added).

One could argue that the ITCA does not govern constitutional tort claims against *the State itself*, because permissible claims against the State are limited to those that would be available against a private party. *See id.* § 669.2(3)(*a*) (defining "claim" as involving "circumstances where the state, if a private person, would be liable to the claimant for such damage, loss, injury, or death"). Usually, private persons, unless acting under color of state law, cannot commit constitutional violations. *See Prager v. Kan. Dep't of Revenue*, 20 P.3d 39, 62 (Kan. 2001) ("Kansas has not waived its sovereign immunity under K.S.A. 75–6103(a) as it states that 'each governmental entity shall be liable . . . if a private person would be liable.' A private person is not liable for a constitutional tort and, therefore, the Kansas Department of Revenue and its employees are not liable and retain immunity." (quoting Kan. Stat. Ann § 75-6103(a))); *Zullo v. State*, 205 A.3d 466, 479 (Vt. 2019) ("[T]he ultimate question of whether Trooper Hatch acted in compliance with plaintiff's constitutional rights turns on law enforcement responsibilities that have no private analog."); *see also FDIC v. Meyer*, 510 U.S. 471, 478, 114 S. Ct. 996, 1001 (2014) (discussing similar language in the Federal Tort Claims Act and concluding that "the United States simply has not rendered itself liable under § 1346(b) for constitutional tort claims"). By this chain of reasoning, claims of constitutional violations against the State would not fall within the ambit of the ITCA. This could lead to the incongruous situation where the constitutional claim originally asserted against the employee falls within the ITCA but the claim against the State itself does not.

At least one jurisdiction has found that similar statutory language in its tort claims act does not prevent it from being applied to

---

Hence, section 669.21 acknowledges that the definition of "claim" as to employees includes constitutional claims. Notably, the dissent disregards this point.

constitutional torts.  In *Brown v. State*, the Court of Appeals of New York had to interpret a New York law that waived sovereign immunity "in accordance with the same rules of law as applied to actions in the supreme court against individuals or corporations."  674 N.E.2d 1129, 1134 (N.Y. 1996).  The State argued that this language rendered the New York law inapplicable, because "[i]ndividuals and corporations . . . cannot be sued for constitutional violations." *Id.* at 1135.  The court disagreed and found that the jurisdictional provisions of the act applied.  *Id.* at 1135–36.  It reasoned that the search and seizure and equal protection claims asserted by the plaintiffs were "sufficiently similar to claims which may be asserted by individuals and corporations in [trial court] to satisfy the statutory requirement." *Id.* at 1136.

Our only prior decision on point has followed the New York approach.  In *Adam v. State*, we considered whether a damages claim for negligent licensing and inspection of a grain elevator by a state agency fell within the ITCA.  380 N.W.2d 716, 725 (Iowa 1986) (en banc).  The State argued that it did not because private persons did not have a duty to inspect grain elevators, only the State did. *Id.* at 724.  We pushed back on this line of thinking, stating:

> Inspecting and licensing functions are generally thought of as "uniquely governmental."  Where the governmental activity is not normally performed by private individuals, the question is whether a private individual doing what the government was doing would be liable for negligence.

*Id.* (quoting *Hylin v. United States*, 715 F.2d 1206, 1210 (7th Cir. 1983), *vacated and remanded on other grounds*, 469 U.S. 807, 105 S. Ct. 65, 83 L. Ed. 2d 16 (1985)).  We found the claim did fall within the ITCA, reasoning, "Under Iowa law private individuals would be liable for conduct such as we have here if the statute and regulations were directed at them."

*Id.* By the same token, under the allegations of Wagner's complaint, a private individual would have been liable for her son's death if article I, sections 8 and 9 of the Iowa Constitution were directed at private individuals.

In other words, *Adam* took the view that the ITCA applied even if the relevant duty only attached to the government, so long as the underlying conduct was tortious in nature and would have given rise to a tort claim against a private party if the same duty were imposed on a private party. By that standard, the ITCA could apply to the constitutional tort claims in this case. The gist of Wagner's state constitutional claims is that Officer Spece seized Jensen with excessive force—indeed, killed him—and acted with indifference to his life in violation of article I, sections 8 and 9. Although a private party engaging in the same alleged conduct would not be committing constitutional violations unless acting under color of state law, that party would be committing several torts. "Constitutional torts are torts." *Baldwin I*, 915 N.W.2d at 281.

But there is additional language in the ITCA we must consider. Wagner maintains that all the claims in this case fall outside the ITCA because they involve assault, battery, or their functional equivalents. *See* Iowa Code § 669.14(4) (excepting claims for assault and battery from the ITCA).

Literally, of course, a claim under the Iowa Constitution and common law assault and battery are two different causes of action. Iowa Code section 669.14(4) mentions the latter but not the former. However, some time ago this court held that the section immunized the State from suit on a federal constitutional claim that was "the functional equivalent" of an explicit section 669.14(4) exception. *Greene v. Friend of Ct.*, 406 N.W.2d 433, 436 (Iowa 1987). *Greene* involved an individual who had been

allegedly jailed without due process and then brought suit for damages. *Id.* at 434. There we explained,

> The latter section [now section 669.14(4)] identifies excluded claims in terms of the type of wrong inflicted. The gravamen of plaintiff's claim in the present case is the functional equivalent of false arrest or false imprisonment, which are both [now section 669.14(4)] exceptions to the Iowa Tort Claims Act. Consequently, we agree with the position of [the Department of Human Services] that the State has not waived its sovereign immunity or that of its alter ego agencies with respect to the type of claim presented in this case.

*Id.* at 436.

In short, we decided that section 669.14(4) also foreclosed claims that were the functional equivalent of the identified claims. *Id.* We have reiterated this point in a number of cases. *See, e.g., Smith v. Iowa State Univ. of Sci. & Tech.,* 851 N.W.2d 1, 20–21 (Iowa 2014) ("[W]e have made clear that if a claim is the functional equivalent of a section 669.14 exception to the ITCA, the State has not waived its sovereign immunity."); *Trobaugh v. Sondag,* 668 N.W.2d 577, 584 (Iowa 2003) ("[W]here '[t]he gravamen of plaintiff's claim . . . is the functional equivalent' of the causes of action listed in Iowa Code section 669.14(4), the claim cannot be pursued successfully against the State." (second alternation in original) (quoting *Greene,* 406 N.W.2d at 436)); *Hawkeye By-Prods., Inc. v. State,* 419 N.W.2d 410, 411–12 (Iowa 1988) (en banc) (holding that when the gravamen of plaintiffs' claims is covered by what is now section 669.14(4), "such claims will not lie against the sovereign").

The Federal Tort Claims Act (FTCA) also excludes claims for "assault" and "battery," although it excepts "acts or omissions of investigative or law enforcement officers of the United States Government." 28 U.S.C. § 2680(h). Federal courts have found that this language excludes excessive force claims if the employee involved was not an

investigative or law enforcement officer. *See, e.g., Stepp v. United States*, 207 F.2d 909, 911 (4th Cir. 1953) (holding that a claim that arose when a sentry shot and killed a fleeing suspect was barred by the FTCA because "[i]t is well established that an intentional use of excessive force in making an arrest amounts to an assault and battery"). "We have . . . been guided by interpretations of the FTCA, which was the model for the ITCA, when the wording of the two Acts is identical or similar." *Thomas v. Gavin*, 838 N.W.2d 518, 525 (Iowa 2013); *see also Smith*, 851 N.W.2d at 21.

**C. To Honor the Existing Legislative Framework to the Extent Possible, ITCA Procedures Should Apply to Constitutional Tort Claims Against the State**. We assume, therefore, that the section 669.14(4) exclusion within the ITCA precludes Wagner's constitutional claims. However, the legislature did not contemplate that such claims could be brought outside the ITCA. The ITCA states, "The immunity of the state from suit and liability is waived to the extent provided in this chapter." Iowa Code § 669.4(3). In other words, the State's immunity from suit and liability remains in effect unless the ITCA permits the claim. We have said as much on multiple occasions. *See Trobaugh*, 668 N.W.2d at 584 ("[T]he [functionally equivalent] claim cannot be pursued successfully against the State."); *Hawkeye By-Prods.*, 419 N.W.2d at 412 ("[S]uch claims will not lie against the sovereign.").

An underlying premise behind the ITCA was that it would cover all available tort damage claims against the State and state employees acting within the scope of their employment. None had been allowed before. "Prior to passage of the Iowa Tort Claims Act in 1965, the maxim that 'the King can do no wrong' prevailed in Iowa. No tort action could be maintained against the State or its agencies." Don R. Bennett, *Handling Tort Claims and Suits Against the State of Iowa: Part I*, 17 Drake L. Rev.

189, 189 (1968) (footnote omitted); *see also Montandon v. Hargrave Constr. Co.*, 256 Iowa 1297, 1299, 130 N.W.2d 659, 660 (1964) ("[The State] is immune from suit except where immunity is waived by statute and . . . there is no statutory waiver or consent to jurisdiction in tort actions.").

"[I]t must be remembered the State began from a position of complete immunity and waived that immunity on a limited basis by enacting the state tort claims act." *Speed v. Beurle*, 251 N.W.2d 217, 219 (Iowa 1977). "Prior to enactment of [the ITCA], our courts lacked jurisdiction over suits brought against the state or its agencies sounding in tort." *Lloyd v. State*, 251 N.W.2d 551, 555 (Iowa 1977). "The immunity of the State is from suit rather than from liability and remains the rule rather than the exception." *Id.* "Claims which are outside the scope of the waiver must be denied." *Gartin v. Jefferson Cnty.*, 281 N.W.2d 25, 26 (Iowa Ct. App. 1979). "[Until the ITCA was enacted], tort suits could not be brought against the state because such suits were prohibited by the doctrine of sovereign immunity. The state may now be sued in tort only in the manner and to the extent to which consent has been given by the legislature." *Hansen v. State*, 298 N.W.2d 263, 265 (Iowa 1980). "The doctrine of sovereign immunity dictates that a tort claim against the state or an employee acting within the scope of his office or employment with the state must be brought, if at all, pursuant to [the ITCA]." *Dickerson v. Mertz*, 547 N.W.2d 208, 213 (Iowa 1996). The ITCA "waives sovereign immunity for tort claims against the State" and "provides a remedy for a cause of action already existing which would have otherwise been without remedy because of common law immunity." *Minor*, 819 N.W.2d at 405 (quoting *Engstrom v. State*, 461 N.W.2d 309, 314 (Iowa 1990)). "By enacting the ITCA, the State waived this immunity and opened itself to suit, but it did so strictly on its terms." *Segura v. State*, 889 N.W.2d 215,

221 (Iowa 2017). "Simply stated, the [ITCA] sets the metes and bounds of the State's liability in tort." *Swanger v. State*, 445 N.W.2d 344, 349 (Iowa 1989).[5]

In *Godfrey II*, we held that under certain circumstances, an aggrieved party could bring a constitutional claim against the State even though the legislature had not enacted a damages remedy for violation of that constitutional provision. 898 N.W.2d at 871–72 (plurality opinion), 880 (Cady, C.J., concurring in part and dissenting in part). With our holding in *Godfrey II*, we overruled *sub silentio* cases like *Speed*, which confirmed the State's "complete immunity," 251 N.W.2d at 219, and *Montandon*, which proclaimed the State "is immune from suit except where immunity is waived by statute," 256 Iowa at 1299, 130 N.W.2d at 660.

To get there, we circled back to earlier Iowa caselaw. *See Godfrey II*, 898 N.W.2d at 862–63 (discussing *McClurg v. Brenton*, 123 Iowa 368, 98 N.W. 881 (1904); *Krehbiel v. Henkle*, 142 Iowa 677, 121 N.W. 378 (1909); *State v. Tonn*, 195 Iowa 94, 191 N.W. 530 (1923); and *Girard v. Anderson*, 219 Iowa 142, 257 N.W. 400 (1934)). Yet none of the cases we discussed involved damages claims against the State or state officials. All involved damages claims (actual or hypothetical) against local officials or private persons. *Girard*, 219 Iowa at 144, 257 N.W. at 400–01 (private individual); *Tonn*, 195 Iowa at 99–100, 191 N.W. at 532–33 (local officials); *Krehbiel*, 142 Iowa at 678–79, 121 N.W. at 379 (private individual); *McClurg*, 123 Iowa at 370, 98 N.W. at 882 (local official).

*Godfrey II* cited no Iowa precedent for a direct constitutional claim for damages against the State or state officials. In fact, Iowa precedent was to the contrary. In *Yoerg v. Iowa Diary Commission*, we upheld the

---

[5]The pre-1965 immunity extended to state officials when performing official duties. *See, e.g.*, *Anderson v. Moon*, 225 Iowa 70, 73, 279 N.W. 396, 397 (1938).

dismissal of a suit for recovery of tax payments alleging violations article I, sections 1, 6, and 9; article III, section 31; and article VII, sections 1 and 7 of the Iowa Constitution. 244 Iowa 1377, 1379, 1387, 60 N.W.2d 566, 567, 571 (1953). We decided that "the suit against the commission was substantially against the state, which was immune therefrom." *Id.* at 1387, 60 N.W.2d at 571. In *Collins v. State Board of Social Welfare*, which involved a claim under article I, section 6 of the Iowa Constitution, we acknowledged "that in the absence of specific consent by the State, it or its agencies may not be sued in an action to obtain money from the State." 248 Iowa 369, 372, 81 N.W.2d 4, 6 (1957). We granted relief in *Collins* only after determining that the suit was simply "to require [the State's] officers and agents to perform their duty," i.e., the equivalent of an equitable proceeding. *Id.* at 373, 81 N.W.2d at 6.

So it is fair to say that when the ITCA was adopted in 1965, or even when it was subsequently amended, the legislature would not have considered it necessary to mention constitutional torts in the ITCA, because there was no Iowa precedent allowing the State or its officials acting within the scope of their employment to be sued in damages for a constitutional tort. By not mentioning such suits expressly in the ITCA, the legislature did not open the door for them to be brought in some other fashion. The ITCA drove home this point by limiting the waiver "to the extent provided in this [chapter]." 1965 Iowa Acts ch. 79, § 4 (now codified at Iowa Code § 669.4(3)). The ITCA allowed the State to be sued in tort for the first time and imposed a set of procedures for doing so. *Id.* We should not disregard those legislatively prescribed procedures.

The question can be viewed as one of severability. *See* Iowa Code § 4.13 (stating that provisions and applications of legislation are intended to be severable in the event that a particular provision or application is

invalid). Again, Iowa Code section 669.4(3) waives the State's immunity from suit only "to the extent provided in this chapter." Iowa Code sections 669.14(4) and 669.23 preclude claims against the State and state employees acting within the scope of their employment for assault and battery or their equivalent. *See Trobaugh*, 668 N.W.2d at 584; *Hawkeye By-Prods.*, 419 N.W.2d at 411–12. If we strike those limits on constitutional tort suits, does it follow we should strike all the procedures in the ITCA? We think not.

Alternatively, the question can be viewed as one of the appropriate framework *we* should adopt for bringing constitutional torts. Should we use the existing statutory framework for other tort claims against the State? We think we should. For one thing, the legislature intended the ITCA to be the mechanism for suing the State in tort whenever tort suits were permitted. Also, not all constitutional tort causes of action fall under an Iowa Code section 669.14 exception. Such tort claims must be brought under the ITCA, at least when state employees are named, even without considering issues of severability. In our view, it does not make sense to have two different procedural pathways for constitutional tort claims, with the potential for uncertainty in a given case as to which pathway applies.

In *Godfrey II*, we concluded, at least implicitly, that the ITCA did not foreclose a direct constitutional damages claim against the State and state employees acting in their official capacity. 898 N.W.2d at 871–72 (plurality opinion), 880 (Cady, C.J., concurring in part and dissenting in part). The issue before us now is whether the procedural limits of the ITCA should nonetheless apply to such a claim. It is logical to hold that constitutional torts, like other torts, are subject to the procedures set forth in the ITCA. Just because the substantive barriers to liability in the ITCA do not apply, that does not mean we should dispense with the entire ITCA. "The self-

evident purpose of the [ITCA] is to provide an orderly method by which to compensate those tortiously damaged by any officer, agent or employee of the state as defined by the Act." *Graham v. Worthington*, 259 Iowa 845, 853, 146 N.W.2d 626, 632 (1966).

In *Godfrey II*, the dispositive concurrence in part agreed with the lead opinion that tort claims for damages under the Iowa Constitution should be available even without legislative authorization. 898 N.W.2d at 880 (Cady, C.J., concurring in part and dissenting in part). Yet, it also concluded that the legislature could provide its own remedy for the constitutional violation in lieu of a court-devised remedy so long as it was an "adequate remedy." *Id.* at 880–81. *See also Baldwin I*, 915 N.W.2d at 265 (summarizing *Godfrey II*). The procedural components of the ITCA, such as the requirement to present claims for adjustment and settlement before bringing suit and the two-year statute of limitations, *see* Iowa Code §§ 669.3, .5(1), .13, do not deprive a plaintiff such as Wagner of an adequate remedy. Unlike the immunities set forth in the ITCA, these procedural requirements don't go to ultimate questions of liability and damages. The legislature intended the ITCA to be the only path for suing the State and state officials acting in their scope of employment on a tort claim. Consistent with *Godfrey II*, ITCA procedures should apply to constitutional torts.[6]

---

[6]The dissent urges that there is no issue of severability, rejects the ITCA altogether, and endorses a scheme for constitutional torts entirely free-formed by this court. To show why the dissent is incorrect, we restate our position. Until 2017, the only recognized way to sue the State on a tort damages claim, including a constitutional tort damages claim, was by legislative authorization. The ITCA had confirmed the general rule of "[t]he immunity of the state from suit," but "waived" that immunity "to the extent provided in this chapter." Iowa Code § 669.4(3). Prior to 2017, we had also repeatedly recognized that claims could not be pursued against the State that were the functional equivalent of a section 669.14(4) exclusion. *See Trobaugh*, 668 N.W.2d at 584; *Hawkeye By-Prods.*, 419 N.W.2d at 411–12; *Greene*, 406 N.W.2d at 436. In *Godfrey II*, we said in effect those limits didn't matter. The legislature can't block constitutional tort claims completely; it can only regulate them. So Iowa Code sections 669.3(3)(*a*) and 669.14(4),

*Baldwin I* is also consistent with our answer to this certified question. In *Baldwin I*, we shaped and refined the independent damages claim for constitutional violations we had just recognized in *Godfrey II*. The immunity question we decided was one of substantive law. It presents no obstacle to today's holding that ITCA procedures govern such claims.

### IV. Is the Available Remedy Under the Iowa Tort Claims Act for Excessive Force by a Law Enforcement Officer Inadequate Based on the Unavailability of Punitive Damages? If Not, What Considerations Should Courts Address in Determining Whether Legislative Remedies for Excessive Force Are Adequate?

We now turn to whether punitive damages are potentially available when a plaintiff brings a direct constitutional claim based on a state law enforcement officer's use of excessive force. The ITCA prohibits an award of punitive damages against the State. *See* Iowa Code § 669.4(2) (providing that "the state shall not be liable for interest prior to judgment or for punitive damages"). Under the ITCA this bar operates regardless of how

---

to the extent they may block Wagner's tort claims, are unconstitutional. But we do not discard other statutory language regulating those claims.

Ironically, the dissent accuses us of "judicial legislation." But it is the dissent that wants free rein to devise procedures and remedies unimpeded by laws and precedent actually on the books. At the same time, we doubt the dissent believes there are really *no* existing limits on constitutional tort claims. For example, is there a statute of limitations? If so, where does it come from? If not from the ITCA, then from where?

The dissent also suggests that the majority has proceeded in a manner that is procedurally unfair to Wagner. We respectfully disagree. The certified questions speak for themselves. The parties' briefs on those questions are publicly available. Wagner elected to devote only minimal briefing—slightly over one page—to the central question of whether the ITCA applies to her constitutional tort claims. The defendants devoted fifteen pages of briefing to that issue. The defendants' brief concludes that "the ITCA applies to constitutional tort actions against the state and state employees, and the ITCA's terms are conditions of waiver of sovereign immunity that cannot be dissevered." Unpacking the double negative (i.e., "cannot" and "dissevered"), this is another way of saying that the ITCA's terms should stay in place to the extent possible and should therefore be applied to this case. That is essentially what we have concluded.

Finally, in a footnote, the dissent engages in some hair-splitting over the meaning of the word "apply." Obviously, the majority concludes that the procedural provisions of the ITCA apply to Wagner's constitutional tort claims and the dissent concludes they do not. We have given reasons why they apply; the dissent disagrees with those reasons.

the State became a defendant—i.e., whether the State was an original defendant, was substituted as a defendant for a state employee, or both. *See id.* § 669.5(2)(*a*). Thus, if a state law enforcement officer acted within the scope of employment, the State will normally be substituted as a defendant, and any liability thereafter can rest only with the State. *See id.*; *Godfrey v. State* (*Godfrey I*), 847 N.W.2d 578, 588 (Iowa 2014); *Iowa Beta Chapter of Phi Delta Theta Fraternity v. State*, 763 N.W.2d 250, 267 (Iowa 2009) (explaining that Iowa Code section 669.5(2)(*a*) "relieve[s] a state employee from personal liability when the employee is acting within the scope of his or her employment").

We have determined in our answer to the previous question that the ITCA governs procedural aspects of state constitutional claims against the State. The availability of punitive damages, however, is a matter of substantive law, so that determination does not control here.

**A. *Godfrey II* and *Baldwin II* on Punitive Damages**. *Godfrey II* recognized that a statutory cause of action will displace a direct constitutional claim for damages so long as the statute contains an adequate remedy. 898 N.W.2d at 880–81 (Cady, C.J., concurring in part and dissenting in part). Punitive damages were at the heart of this debate in *Godfrey II*. The ICRA, which authorizes a damages remedy for discrimination based on sexual orientation, does not permit punitive damages. *Id.* at 881. The concurrence in part, which cast the decisive vote, did not believe the absence of punitive damages rendered the ICRA remedy inadequate. *Id.* For that reason, the concurrence in part joined the dissent in refusing to recognize a parallel constitutional tort claim for damages for sexual-orientation discrimination under article I, section 6. *Id.*

The concurrence in part made several observations about the adequacy of remedies without punitive damages. It noted that "the remedies provided in the ICRA are robust, even without punitive damages." *Id.* They include damages for emotional distress and attorney fees. *Id.* The concurrence in part also noted that "the claimed harm [to the plaintiff was] largely monetary in nature and [did] not involve any infringement of physical security, privacy, bodily integrity, or the right to participate in government, and instead [was] against the State in its capacity as an employer." *Id.* Finally, the concurrence in part added that "[i]n the appropriate case, a remedy of punitive damages may be necessary to vindicate a plaintiff's constitutional rights." *Id.*

Seemingly, on the question of whether punitive damages are necessary for an adequate remedy for a constitutional violation, the *Godfrey II* concurrence in part outlined a case-by-case approach rather than a single legal standard. *Id.* at 880–81. But *Godfrey II* was not our last word on the subject. Two years later, in *Baldwin II*, this court held that punitive damages are categorically unavailable against a municipality on a constitutional tort claim, upholding the limitation in section 670.4(1)(*e*) of the IMTCA. 929 N.W.2d at 698–99. Six members of the court joined the majority opinion in *Baldwin II*, including one who had been part of the plurality in *Godfrey II* and the author of the concurrence in part. Only one member of the court, in a partial dissent, urged that punitive damages should be available against a municipality in some circumstances "to provide an adequate remedy." *Id.* at 703, 715 (Appel, J., concurring in part and dissenting in part). The partial dissent insisted that the *Baldwin II* court was retreating from *Godfrey II*. *See id.* at 712–13 ("For the majority of the Godfrey [II] court, it seems clear as a matter

[of] constitutional law that punitive damages should be available in at least some cases notwithstanding legislative action to the contrary.").

*Baldwin II* thus moved away from the case-by-case approach in the *Godfrey II* concurrence in part and indicated that *the legislature* could determine whether punitive damages would be available on a constitutional tort claim.

**B. Determining the Proper Approach Here**. With respect to claims against the State and state employees for tortious conduct, the legislature has clearly indicated that punitive damages should not be available. *See* Iowa Code § 669.4(2). If we strictly followed *Baldwin II*, we could give Iowa Code section 669.4(2) the same conclusive effect that section 670.4(1)(*e*) received in *Baldwin II*.

Or we could use as our guidepost the earlier *Godfrey II* concurrence in part. As already noted, the concurrence in part focused on the adequacy of the remedy for the constitutional violation. *See Godfrey II*, 898 N.W.2d at 880 (Cady, C.J., concurring in part and dissenting in part) (referring to "an adequate remedy"). However, the concurrence in part did not provide a single standard for deciding whether a remedy was adequate. One key consideration was deterrence, i.e., whether the available remedies "suffice as an adequate deterrent of any alleged unconstitutional conduct." *Id.* at 881. Elsewhere, the concurrence in part emphasized that the *Godfrey* case did not involve "physical invasion, assault, or violations of other liberty interests." *Id.* It also highlighted the availability of attorney fees under the ICRA. *Id.* Still elsewhere, the concurrence in part pointed out that "Godfrey makes no claim that an action under the ICRA will not adequately compensate him for damages relating to the alleged unconstitutional conduct." *Id.* Compensation is not necessarily the same thing as deterrence.

For the present case, we find persuasive the following reasoning that draws on both *Baldwin II* and the *Godfrey II* concurrence in part. The general assembly not only has prohibited excessive force claims against the State, it has prohibited awards of punitive damages against the State and state employees acting within their scope of employment. Even though we have decided that the first limit must give way to the paramount role of the Iowa Constitution in our system of government, we are still compelled to honor the second limit to the extent constitutionally possible. Almost by definition, punitive damages are not remedial. They punish. *See City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 266–67, 101 S. Ct. 2748, 2759 (1981) ("Punitive damages by definition are not intended to compensate the injured party, but rather to punish the tortfeasor whose wrongful action was intentional or malicious, and to deter him and others from similar extreme conduct.").

In another context, we have held there is no "vested right" to punitive damages prior to entry of judgment and the legislature may—in effect—confiscate most of them from a victorious plaintiff for the benefit of the State. *Shepherd Components, Inc. v. Brice Petrides-Donohue & Assocs.*, 473 N.W.2d 612, 619 (Iowa 1991) (upholding the constitutionality of Iowa Code section 668A.1). We have also held repeatedly that punitive damages abate on the death of the wrongdoer, noting that this does not interfere with the plaintiff's ability to receive "such sum as will fully compensate him for the injury sustained." *In re Vajgrt*, 801 N.W.2d 570, 573 (Iowa 2011) (quoting *Sheik v. Hobson*, 64 Iowa 146, 148, 19 N.W. 875, 875 (1884)). It is difficult to see, therefore, that the unavailability of punitive damages would render a remedy inadequate in most cases. At least in an excessive force case without other unconstitutional conduct where any

actual damages will likely be significant, we are not persuaded to overturn the bar on punitive damages imposed by the legislature.[7]

Again, the answer we provide today would not necessarily be the same answer in a different kind of constitutional tort case. With other kinds of unconstitutional conduct, such as invidious discrimination or suppression of free speech, a traditional award of actual damages may not correspond with the harm actually caused. For example, if the unconstitutional conduct involved not merely excessive force but also a discriminatory use of force in violation of article I, section 6, a broader remedy might be appropriate.[8]

---

[7]Nothing herein, of course, prevents Wagner from pursuing punitive damages on her claims under 42 U.S.C. § 1983 against Officer Spece in his individual capacity. The dissent cites various cases for the proposition that "many excessive force cases have awarded both actual and punitive damages." But every one of these citations involved an action under 42 U.S.C. § 1983, where punitive damages were awarded pursuant to a *statute* enacted by Congress. None involved a direct action under a state constitution.

[8]A brief comment should be made on *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388, 91 S. Ct. 1999 (1971), and *Carlson v. Green*, 446 U.S. 14, 100 S. Ct. 1468 (1980). Discussing only those two cases does not paint an accurate picture of federal constitutional damages litigation. *Carlson*, decided forty years ago, was the last time the United States Supreme Court recognized a direct damages claim under the United States Constitution. *Hernandez v. Mesa*, ___, U.S. ___, ___, 140 S. Ct. 735, 743 (2020). Since 1980, the Court has "changed course," *id.* at ___, 91 S. Ct. at 741, and "consistently rebuffed requests to add to the claims allowed under *Bivens*," *id.* at ___, S. Ct. at 743. In an excessive force case decided this year, the Court not only rejected a direct constitutional damages claim against the federal government, it added that "it is doubtful that we would have reached the same result" if *Bivens* and *Carlson* were before the Court today. *Id.* at ___, S. Ct. at 742–43.

Thus, in comparison with the constitutional tort remedy currently available for federal constitutional violations, the claim we recognized in *Godfrey II* is robust.

In addition, the dissent to some extent conflates federal constitutional claims against the federal government with federal constitutional claims against municipalities and state and local officials. The latter are based on a statute. *See* 42 U.S.C. § 1983. Section 1983, unlike the ITCA, does not bar punitive damages. Rather, it states that the defendants "shall be liable to the party injured in an action at law." *Id.* This has been interpreted as authorizing an award of punitive damages against individuals (but not governmental entities) in an appropriate case. *See City of Newport*, 453 U.S. at 267–68, 101 S. Ct. at 2760.

**V. Are the Plaintiffs' Claims Under the Iowa Constitution Subject to the Administrative Exhaustion Requirement in Iowa Code Section 669.5(1)?**

Yes. See the discussion in division III of this opinion.

**VI. Are the Plaintiffs Required to Bring Their Iowa Constitutional Claims in the Appropriate Iowa District Court Under Iowa Code Section 669.4?**

We begin with a point of federal law recognized by the federal district court. The Eleventh Amendment to the United States Constitution provides, "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." Although the Eleventh Amendment literally bars only lawsuits against states by persons residing outside the state, the United States Supreme Court has held for over a century that it also limits the ability of citizens to sue their own state in federal court. *Hans v. Louisiana*, 134 U.S. 1, 15, 10 S. Ct. 504, 507 (1890).

From this starting point, it follows that a citizen generally cannot sue a state on a state-law claim in federal court absent the state's consent. *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 98–99, 104 S. Ct. 900, 907 (1984). Also, Eleventh Amendment immunity may only be "waived by consent or a voluntary appearance, by statute, or by the state's conduct in the suit." *Shumaker v. Iowa Dep't of Transp.*, 541 N.W.2d 850, 853 (Iowa 1995). Eleventh Amendment immunity extends to state-law claims asserted in federal court by way of supplemental jurisdiction. *See Raygor v. Regents of the Univ. of Minn.*, 534 U.S. 533, 541–42, 122 S. Ct. 999, 1005 (2002).

Moreover, Eleventh Amendment immunity applies to claims under a state constitution. *See Vasquez v. Rackauckas*, 734 F.3d 1025, 1041

(9th Cir. 2013) (finding that the Eleventh Amendment barred a claim under the California Constitution against a state official); *Spoklie v. Montana*, 411 F.3d 1051, 1060 (9th Cir. 2005) ("Spoklie claims that I–143 violates his property rights under Article II, section 3, of the Montana Constitution. However, the Eleventh Amendment prevents him from asserting that claim in federal court. To the extent he seeks damages from the State and from DFWP, the Eleventh Amendment stands directly in his way."); *Mixon v. Ohio*, 193 F.3d 389, 397 (6th Cir. 1999) ("Some of Plaintiffs' claims against the State of Ohio here are under the Ohio Constitution and Ohio common law. Although Ohio has statutorily waived its state sovereign immunity against certain state court actions by consenting to state suits in the Ohio Court of Claims, a State may retain Eleventh Amendment immunity from suit in federal court even if it has waived its immunity and consented to be sued in its state courts." (citation omitted)); *Vill. of Orland Park v. Pritzker*, ___ F. Supp. 3d ___, ___, 2020 WL 4430577, at *14 (N.D. Ill. Aug. 1, 2020) (holding the Eleventh Amendment bars claims in federal court against the Governor of Illinois under the Illinois Constitution); *Support Working Animals, Inc. v. DeSantis*, 457 F. Supp. 3d 1193, 1207 n.6 (N.D. Fla. 2020) ("Plaintiffs argue Florida waived its sovereign immunity for federal suits 'based on violations of the state or federal constitution.' The cases relied upon by Plaintiffs were both filed in state court and involved sovereign immunity under state law, not the Eleventh Amendment. . . . [T]his Court finds that Plaintiffs have not established that Florida has waived its Eleventh Amendment immunity as to any of the claims in this case." (citations omitted)); *Veasey v. Perry*, 29 F. Supp. 3d 896, 922 (S.D. Tex. 2014) (finding no jurisdiction over claims under the Texas Constitution because any waiver of the Eleventh Amendment would have to be "unequivocal" and "[n]o such

unequivocal consent appears here, where the State has asserted its Eleventh Amendment rights"); *Common Cause/Ga. v. Billups*, 406 F. Supp. 2d 1326, 1358 (N.D. Ga. 2005) ("[T]he Eleventh Amendment precludes the Court from entertaining Plaintiffs' claims asserted under the Georgia Constitution."); *Doe v. Div. of Youth & Fam. Servs.*, 148 F. Supp. 2d 462, 492 (D.N.J. 2001) (dismissing claims based on the Eleventh Amendment and concluding that "[t]he plaintiffs have not identified any provision of state law where New Jersey has expressly consented to suit in federal court under . . . the New Jersey Constitution").

Additionally, we find no indication that the State of Iowa has generally waived its Eleventh Amendment immunity from suit in federal court as to direct constitutional claims. No such language appears in the Iowa Constitution or the Iowa Code. And our precedents do not support such a waiver. *Godfrey II* didn't address the issue. "[A] State's consent to suit in its own courts is not a waiver of its immunity from suit in federal court." *Sossamon v. Texas*, 563 U.S. 277, 285, 131 S. Ct. 1651, 1658 (2011). While *Godfrey II* emphasized the importance of an adequate remedy for violations of the Iowa Constitution, *Godfrey II*, 898 N.W.2d at 880–81 (Cady, C.J., concurring in part and dissenting in part), nothing in *Godfrey II* or any of our subsequent opinions on direct constitutional claims for damages suggests that federal court access is the key to an adequate remedy. *Godfrey II* was a state court proceeding, and we found the remedies recognized therein to be adequate.[9]

---

[9]Of course, a state may waive its Eleventh Amendment immunity by its conduct in a particular case, for example by removing the case from state to federal court. *See Lapides v. Bd. of Regents of Univ. Sys. of Ga.*, 535 U.S. 613, 624, 122 S. Ct. 1640, 1646 (2002). The present action was originally brought by Wagner in federal court, not removed there by the defendants. Wagner insists it is improper for the State to remove "select" cases arising under the Iowa Constitution to federal court, while it forces other such cases into state court by asserting Eleventh Amendment immunity. Wagner cites no authority for the proposition that selective assertion of Eleventh Amendment immunity

Furthermore, as the federal district court noted, Iowa courts—as opposed to federal courts—have exclusive statutory jurisdiction over claims under the ITCA absent a waiver in a specific case. Iowa Code section 669.4(1) provides,

> The district court of the state of Iowa for the district in which the plaintiff is resident or in which the act or omission complained of occurred, or where the act or omission occurred outside of Iowa and the plaintiff is a nonresident, the Polk county district court has exclusive jurisdiction to hear, determine, and render judgment on any suit or claim as defined in this chapter.

Far from being a consent to federal court jurisdiction, section 669.4(1)'s reference to "exclusive jurisdiction" is a command that such suits be brought *only* in state court. "We construe section 25A.4 [the predecessor of section 669.4] to give Iowa district courts (as distinguished from federal courts) exclusive jurisdiction over state tort claims." *Hyde v. Buckalew*, 393 N.W.2d 800, 802 (Iowa 1986); *see also Teska v. Rasmussen*, 40 Fed. App'x 332, 334 (8th Cir. 2002) (per curiam) ("Iowa has waived Eleventh Amendment immunity for tort claims filed in state court, but has not consented to tort claims filed in federal court."); *Jacobsen v. Dep't of Transp.*, 332 F. Supp. 2d 1217, 1230 (N.D. Iowa 2004) ("Absent reference to either Eleventh Amendment immunity or suit in *federal* court, the court cannot find that § 669.4 provides an express waiver of Eleventh Amendment immunity to suits against the state in federal court."); *Tinius v. Carroll Cnty. Sheriff Dep't*, 255 F. Supp. 2d 971, 985 (N.D. Iowa 2003) ("The Iowa State Tort Claims Act provides that Iowa state district courts have exclusive jurisdiction to determine any suit or tort claim under that

---

is impermissible. Regardless, waiver or consent to federal jurisdiction in a particular case is a question of federal law as to which we do not opine. Our point is simply that our judicial recognition of a direct damages claim under the Iowa Constitution in *Godfrey II* does not imply or include a waiver or consent to suit in federal court, even assuming our court had the power to grant such a waiver or consent.

act. Absent reference to either Eleventh Amendment immunity or suit in *federal* court, the court cannot find that § 669.4 provides an express waiver of Eleventh Amendment immunity to suits against the state in federal court.").

Having determined earlier in this opinion that the procedural aspects of the ITCA apply to constitutional tort claims, it naturally follows that section 669.4(1) would apply as well. For these reasons, to the extent the issue is one of Iowa law and not federal law, we hold that direct claims for damages under the Iowa Constitution may be pursued only in the Iowa courts absent the State's consent or waiver in a specific case.

We summarize our answers to the certified questions as follows.

First, an injured party bringing a constitutional tort claim for damages under the Iowa Constitution against the State or a state employee must proceed within the procedural framework of the ITCA. This includes the exhaustion of administrative remedies required by Iowa Code sections 669.3 and 669.5(1) as well as the certification process set forth in section 669.5(2). In fact, those steps were followed in *Godfrey*. *See Godfrey I*, 847 N.W.2d at 581; *id.* at 591 (Mansfield, J., dissenting). If the State employee was acting within the scope of the employee's office or employment, the State will be substituted as a defendant. *See* Iowa Code § 669.5(2); *Godfrey I*, 847 N.W.2d at 587 (majority opinion).

Second, because the ITCA governs, the constitutional tort claim will normally go forward only against the State unless the state employee was not acting within the scope of their office or employment. This means that Eleventh Amendment immunity will likely bar the claim from being pursued in federal court unless the state employee was not acting within the scope of their employment or the State waives Eleventh Amendment immunity (and Iowa Code section 669.4(1)).

Third, in an excessive force case based only on article I, sections 8 and 9, implementing the ITCA's exclusion of punitive damages does not deprive the plaintiff of an adequate remedy and honors legislative purpose.

We conclude with a final observation. In briefing and at oral argument, Wagner's counsel expressed concern about bifurcated proceedings. In this case, the federal claims under the United States Constitution and 42 U.S.C. § 1983 will continue to go forward in federal court, but her state claims can only be pursued in state court. However, that result was by no means inevitable; in fact, it can be easily avoided. All the plaintiff has to do is to bring her federal claims and her *Godfrey* claims (after exhausting the administrative process) in state court. If the defendants do not remove, the entire case remains in state court. If the defendants remove the litigation to federal court, they will be deemed to have waived their right to defend the *Godfrey* claims in a state forum and all the claims will go forward in federal court.

**VII. Conclusion.**

We have provided answers to the certified questions as set forth above. Costs shall be divided equally among the parties. Iowa Code § 684A.

**CERTIFIED QUESTIONS ANSWERED.**

All justices concur except Appel, J., who dissents.

**APPEL, Justice (dissenting).**

I respectfully dissent.

At the outset, I do not believe a direct constitutional cause of action under the Iowa Constitution is subject to the Iowa Tort Claims Act (ITCA), Iowa Code chapter 669. A careful reading of the statute demonstrates that direct constitutional claims involving excessive force are not covered by the ITCA even assuming that such causes of action are within the definition of "claim" in the ITCA. While the gateway into chapter 669 is established by the definition of "claim" in Iowa Code section 669.2(3) (2019), an exit ramp appears in section 669.14. Iowa Code section 669.14(4) provides that "[t]he provisions of this chapter shall not apply, with respect to any claim against the state . . . arising out of assault, [or] battery." So, even if the constitutional claims in this case are brought in through the gateway definition of "claim" in Iowa Code section 669.2(3), they slide right out on the exit ramp of the chapter provided in section 669.14.

The majority seeks to prevent the plaintiffs' use of the exit ramp created by the legislature by seeking to sever it from the statute. But courts only sever *unlawful* provisions of a statute. There is nothing unlawful about writing a statute with a broad gateway and a later exit ramp. In the exit ramp of the ITCA, the legislature has simply declared that regardless of how broad and all-encompassing the definition of "claim" might be, the legislature has expressly decided that claims involving assault and battery are taken right out of the chapter.

In any event, even if the exclusion of assault and battery from the scope of the statute is somehow illegal or can somehow be avoided by judicial fiat, there is a further problem with the majority's severance

theory. The legislature has expressly declared, in clear and unambiguous terms, that claims involving assault and battery are not within the scope of chapter 669. While the doctrine of severance is a tool that can be used to save otherwise lawful provisions of a statute by removing an invalid section, the doctrine of severance cannot be used *to expand the scope of a statute in defiance of an express limitation approved by the legislature.* The doctrine of severance simply cannot be used by the judiciary to remove a provision of a statute that has the effect of expanding the scope of the statute in a fashion that the legislature expressly prohibited.

In the alternative to its severance theory, the majority declares that constitutional torts should be subject to the limitations in the ITCA regime even if the plaintiffs' claim is not within the scope of the statute. We have never created such judicially imposed limitations on common law claims, and I would not adopt them in the context of direct constitutional causes of action.

Finally, the declaration that punitive damages are not required to provide an adequate remedy for excessive force claims under the Iowa Constitution where there is a likelihood of "substantial" actual damages, unless there is a second constitutional violation, cannot go by unchallenged. To take punitive damages off the table in any well pled excessive force case under the Iowa Constitution at the pleading stage as a matter of law is an error with serious potential consequences in this and future cases.

### I. Introduction.

The premier provision of the Iowa Constitution is article I, the Iowa Bill of Rights. It was deliberately placed in the first substantive article for a reason. It is a basic statement of rights possessed by the people of Iowa

that could not be abridged by the government established by subsequent articles of the constitution.

The Iowa Bill of Rights is not a mere "glittering generality." It is constitutional bedrock. As noted by one state supreme court with respect to a search and seizure provision similar to article I, section 8 of the Iowa Constitution,

> It insulates us from dictatorial and tryannical [sic] rule by the state, and preserves the concept of democracy that assures the freedom of its citizens. This concept is second to none in its importance in delineating the dignity of the individual living in a free society.

*Commonwealth v. Miller*, 518 A.2d 1187, 1192 (Pa. 1986).

The Iowa Bill of Rights draws its authority from the people of Iowa who ratified the Iowa Constitution. It is not a creation of the legislature and is not subject to alteration by it. Not only does the legislature not have the power to amend the rights provided there, it cannot strangle them, directly or indirectly. And it is the prime and essential constitutional role of the Supreme Court of Iowa to ensure that the provisions of the Iowa Bill of Rights flourish, are recognized by all branches of government, and are effectively enforced. In particular, we must be vigilant against encroachments seeking to minimize their scope, undercut their foundation, impose procedural roadblocks, or otherwise diminish them.

And so, we have rightly held that the provisions of the Iowa Constitution provide Iowans with a direct, self-executing cause of action for their enforcement. *Godfrey v. State* (*Godfrey II*), 898 N.W.2d 844, 871–72 (Iowa 2017).[10] Legislative action is not required for enforcement of

---

[10]At least fourteen states have recognized direct causes of action under their state constitutional provisions that are self-executing and require no legislative action for their enforcement. *See, e.g.*, *Gay L. Students Ass'n v. Pac. Tel. & Tel. Co.*, 595 P.2d 592, 602 (Cal. 1979); *Laguna Publ'g Co. v. Golden Rain Found. of Laguna Hills*, 131 Cal. Rptr. 813, 851–54 (Ct. App. 1982); *Binette v. Sabo*, 710 A.2d 688, 693 (Conn. 1998); *Newell v. City*

direct constitutional claims under the Iowa Constitution. Were legislative action required, effective enforcement of the Iowa Bill of Rights would be left up to the legislature.[11] Article V of the Iowa Constitution would be catapulted to become de facto article I, and the Iowa Bill of Rights would be a nothing more than a suggestion, a pretty please, that the legislature could simply decline to enforce. The Iowa Constitution would be one of legislative supremacy, which was distinctly not the intention of the Jacksonian framers and ratifiers of the Iowa Constitution.[12]

The view of the framers that the bill of rights was the most important part of the Iowa Constitution was not some romantic notion. It was rooted in a rugged individualism that respected government but insisted that it be confined within established boundaries. And there were historical antecedents.

---

*of Elgin*, 340 N.E.2d 344, 349 (Ill. App. Ct. 1976); *Moresi v. State*, 567 So. 2d 1081, 1092–93 (La. 1990); *Manikhi v. Mass Transit Admin.*, 758 A.2d 95, 110–11 (Md. 2000); *Widgeon v. E. Shore Hosp. Ctr.*, 479 A.2d 921, 925–28 (Md. 1984); *Phillips v. Youth Dev. Program, Inc.*, 459 N.E.2d 453, 457–58 (Mass. 1983); *Johnson v. Wayne Cnty.*, 540 N.W.2d 66, 69–70 (Mich. Ct. App. 1995); *Mayes v. Till*, 266 So. 2d 578, 580–81 (Miss. 1972); *Dorwart v. Caraway*, 58 P.3d 128, 135–37 (Mont. 2002); *Jackson v. Consol. Rail Corp.*, 538 A.2d 1310, 1319–20 (N.J. Super. Ct. App. Div. 1988); *Strauss v. State*, 330 A.2d 646, 648–50 (N.J. Super. Ct. Law Div. 1974); *Brown v. State*, 674 N.E.2d 1129, 1143–44 (N.Y. 1996); *Corum v. Univ. of N.C.*, 413 S.E.2d 276, 290 (N.C. 1992); *Jones v. Mem'l Hosp. Sys.*, 746 S.W.2d 891, 893–94 (Tex. App. 1988); *Zullo v. State*, 205 A.3d 466, 482 (Vt. 2019); *Old Tuckaway Assocs. Ltd. P'ship v. City of Greenfield*, 509 N.W.2d 323, 328 n.4 (Wis. Ct. App. 1993).

[11]As noted by one scholar commenting on Justice Harlan's concurrence in *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, "To depend on the majority to enact enabling legislation, when the Bill of Rights was specifically designed to limit majority rule, is counterintuitive." Rosalie Berger Levinson, *Recognizing a Damage Remedy to Enforce Indiana's Bill of Rights*, 40 Val. U. L. Rev. 1, 27 (2005) (citing *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388, 407, 91 S. Ct. 1999, 2010 (1971) (Harlan, J., concurring)).

[12]*See Godfrey II*, 898 N.W.2d at 865 (noting the Iowa constitution of 1857 tended to limit the power of the legislature while it protected the independence of the court); *State v. Ochoa*, 792 N.W.2d 260, 274–75 (Iowa 2010) (discussing the politics of the Jacksonian era and the importance the framers of the Iowa Constitution put on the bill of rights).

One of the most famous incidents, well known throughout the founding period of our country but forgotten in some quarters, were the 1763 cases arising out of the publication of a scurrilous publication that appeared in a London magazine making fun of the King and the King's agent. Lord Halifax was not amused. He sent agents to ransack through dozens of houses and places, looking for evidence of who might be the author, and he seized a number of individuals. The dragnet was, of course, a first-class outrage.

One of the persons targeted by Lord Halifax was John Wilkes, a dashing and iconoclastic member of Parliament. In choosing to target Wilkes, Lord Halifax chose poorly. Wilkes promptly filed an action alleging that Lord Halifax's agent had engaged in an unlawful search and seizure under an unlawful general warrant. Lord Pratt, in his instructions to the jury, stated that the official had acted " '*contrary* to the *fundamental principles* of the *constitution*' and stated that the jury could consider the illegal conduct in assessing damages." *Widgeon v. E. Shore Hosp. Ctr.*, 479 A.2d 921, 924 (Md. 1984) (footnote omitted) (citation omitted) (quoting *Wilkes v. Wood* (1763) 98 Eng. Rep. 489). And the jury did just that and awarded Wilkes 1000 pounds, far more than any actual damages. *Wilkes*, 98 Eng. Rep. at 499. According to Lord Pratt,

> [A] jury have it in their power to give damages for more than the injury received. Damages are designed not only as a satisfaction to the injured person, but likewise as a punishment to the guilty, to deter from any such proceeding for the future, and as a proof of the detestation of the jury to the action itself.

*Id.* at 498–99.

In a related case, *Huckle v. Money*, "the plaintiff was awarded exemplary damages after the King's messengers placed him in custody based on an unlawful general warrant." *Widgeon*, 479 A.2d at 924 (citing

*Huckle v. Money* (1763) 95 Eng. Rep. 768). Lord Pratt concluded "that the Secretary of State, who granted the unlawful warrant, had acted [arbitrarily] in violation of the Magna Carta." *Id.* After the jury verdict, Lord Pratt declared:

> [T]he personal injury done to . . . [the plaintiff] was very small, so that if the jury had been confined by their oath to consider the mere personal injury only, perhaps 20*l.* damages would have been thought damages sufficient; but the small injury done to the plaintiff, or the inconsiderableness of his station and rank in life did not appear to the jury in that striking light, in which the great point of law touching the liberty of the subject appeared to them at the trial; they saw a magistrate over all the King's subjects, exercising arbitrary power, violating Magna Charta, and attempting to destroy the liberty of the kingdom, by insisting upon the legality of this general warrant before them . . . I think they have done right in giving exemplary damages; to enter a man's house by virtue of a nameless warrant, in order to procure evidence, is worse than the Spanish inquisition.

*Id.* (alterations in original) (quoting *Huckle*, 95 Eng. Rep. at 768–69).

As noted by one scholar, "[T]he availability of exemplary damages in cases such as *Wilkes* and *Huckle* played a significant role in establishing the salutary principle that no one, no matter how powerful, was above the law." Michael L. Rustad, *Happy No More: Federalism Derailed by the Court That Would Be King of Punitive Damages*, 64 Md. L. Rev. 461, 470 (2005).

There were a number of other cases arising from the incident that reinforced the notion that constitutional norms could not be violated with impunity. Though forgotten by some today, Wilkes himself and the cases arising out of the affair were widely known and celebrated in America and must have been known to the Iowa constitutional framers. *See State v. Ochoa*, 792 N.W.2d 260, 269–73 (Iowa 2010).

So I approach this case in the spirit of the *Wilkes* cases, Lord Pratt, and the Iowa founders. By that, I view it as essential for this court to ensure that that there are robust remedies for violation of any right

established by the Iowa Bill of Rights. This is not a new undertaking. "[T]he judicial obligation to protect the fundamental rights of individuals is as old as this country." *Peper v. Princeton Univ. Bd. of Trs.*, 389 A.2d 465, 476 (N.J. 1978) (quoting *King v. S. Jersey Nat'l Bank*, 330 A.2d 1, 10 (1974)).

**II. Overview of Direct Constitutional Torts Under the Iowa Constitution.**

**A. Introduction.** At the outset, it is important to understand the nature of direct constitutional causes of action under the Iowa Constitution. They are distinctly different from other ordinary tort claims against the government in two critical ways. First, constitutional claims are rooted in the core document approved by the people and are thus not subject to legislative alteration. Second, constitutional claims serve a different purpose than an ordinary tort claim. While an ordinary tort suit seeks to allocate resources, a constitutional claim is designed to curb and restrain government conduct as required by our basic governance document, the Iowa Constitution. A direct constitutional claim has a different pedigree but also serves different goals than a common law tort.

**B. Constitutional Pedigree.** The fact that constitutional causes of action arise from the constitution itself is of critical importance. The constitutional causes of action are not a product of legislative action. They arise from the action of the people in approving a framework of government with a strong bill of rights as its first article. And the constitutional commands cannot be overridden by the legislature. As noted more than a hundred years ago, "The people are sovereign, and speak through their Constitution, and, when they thus speak, its mandates are binding upon all people, and on the Legislature, which is but one of the agencies of government." *C.C. Taft Co. v. Alber,* 185 Iowa 1069, 1073, 171 N.W. 719,

720 (1919). The majority emphasizes the need to honor the legislature, but the people in enacting the Iowa Constitution have established immutable provisions that the legislature may not invade or diminish. *Green v. City of Mt. Pleasant*, 256 Iowa 1184, 1204, 131 N.W.2d 5, 18 (1964) ("The provisions of the Constitution are mandatory and as binding on the legislative branch of the government as on the citizens.")

The constitutionally established rights contained in article I of the Iowa Constitution, and approved by the people as sovereign, are meaningless if not effectively enforced, and in my view, the Iowa Constitution thus requires robust remedies to ensure effective enforcement. The majority is determined to honor the legislature, but in this case, the focus should be on honoring the Iowa Constitution and ensuring its effective enforcement through a robust direct constitutional action.

There are three remedies that must be available for effective enforcement. First, the Iowa Bill of Rights must form an effective shield against government action. Ordinarily, this shield function is served through application of the exclusionary rule in a criminal proceeding. Second, the Iowa Bill of Rights must, where there is an ongoing violation, provide the basis for injunctive relief. Finally, the Iowa Bill of Rights must form the basis of an action for compensatory damages and, where appropriate, punitive damages. All three of the legs of the remedial stool are essential for a comprehensive remedial plan to enable the judiciary to defend against invasions of rights with a "full arsenal" of judicial remedies. *Dorwart v. Caraway*, 58 P.3d 128, 141 (Mont. 2002).

That said, I do agree that the legislature may establish a remedial structure for consideration of constitutional causes of action. Such a structure, however, must provide for adequate remedies not just to

compensate the victim *but also to vindicate the public's interest in constitutional enforcement.* The legislature does not have the power to provide a narrow, tight-fisted, cramped remedial channel for constitutional claims. An adequate channel must be reasonably generous, and most importantly, ensure that not only is the victim compensated but also adequately address the public interest in the enforcement of constitutional provisions to ensure that government actors act within the law. And, as we have said even in the context of a tort action, "illegal or improper acts ought to be deterred by the exaction from the defendant of sums over and above the actual damage he has caused." *Syester v. Banta*, 257 Iowa 613, 629, 133 N.W.2d 666, 676 (1965) (quoting *Amos v. Prom, Inc.*, 115 F. Supp. 127, 137 (N.D. Iowa (1953))).

**C. Constitutional Goals of Modeling and Achieving Government Restraint.** A direct constitutional claim is not an ordinary tort, but is a very special cause of action. Unlike an ordinary common law tort claim, compensation or adjustment of losses is often not the primary goal of a constitutional claim. *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics* itself noted that "[t]he interests protected by state laws regulating trespass and the invasion of privacy, and those protected by the Fourth Amendment's guarantee against unreasonable searches and seizures, may be inconsistent or even hostile." 403 U.S. 388, 394, 91 S. Ct. 1999, 2003 (1971). In rejecting the defendant's claim that the plaintiffs asserting a direct cause of action under the Fourth Amendment should pursue claims under state tort law, the *Bivens* Court responded,

> Respondents seek to treat the relationship between a citizen and a federal agent unconstitutionally exercising his authority as no different from the relationship between two private citizens. In so doing, they ignore the fact that power, once granted, does not disappear like a magic gift when it is wrongfully used. An agent acting—albeit unconstitutionally—

in the name of the United States possesses a far greater capacity for harm than an individual trespasser exercising no authority other than his own. Accordingly, as our cases make clear, the Fourth Amendment operates as a limitation upon the exercise of federal power regardless of whether the State in whose jurisdiction that power is exercised would prohibit or penalize the identical act if engaged in by a private citizen.

*Id.* at 391–92, 91 S. Ct. at 2002 (citations omitted).

The *Bivens* distinction between common law torts and direct constitutional claims has been recognized in state cases involving direct claims under state constitutions.[13] As noted in *Brown v. State*, the plaintiff's right to recover for constitutional torts is not dependent upon availability of common law tort actions that "are heavily influenced by overriding concerns of adjusting losses and allocating risks, matters that have little relevance when constitutional rights are at stake." 674 N.E.2d 1129, 1140–41 (N.Y. 1996); *see also Binette v. Sabo*, 710 A.2d 688, 699 (Conn. 1998) ("[There is an] important distinction between the tortious misconduct of one private citizen toward another, on the one hand, and the violation of a citizen's constitutional rights by a police officer, on the other."); *Moresi v. State*, 567 So. 2d 1081, 1093 (La. 1990) ("The injuries inflicted by officials acting under color of law are substantially different in kind than those inflicted by private parties."); *Clea v. Mayor of Baltimore*, 541 A.2d 1303, 1314 (Md. 1988) ("[T]here are sound reasons to distinguish actions to remedy constitutional violations from ordinary tort suits. The purpose of a negligence or other ordinary tort action is not specifically to protect individuals against government officials or to restrain government officials. The purpose of these actions is to protect one individual against another individual . . . . On the other hand, constitutional provisions . . . are specifically designed to protect citizens against certain types of

---

[13]*See* cases cited in note 1.

unlawful acts by government officials."); *Widgeon*, 479 A.2d at 925 ("It is not the breaking of his doors, and rummaging of drawers, that constitutes the essence of the offense; but it is the invasion of his indefeasible right of personal security, personal liberty, and private property, where that right has never been forfeited by his conviction of some public offense." (emphasis omitted) (quoting *Boyd v. United States*, 116 U.S. 616, 630, 6 S. Ct. 524, 532 (1886))); *Dorwart*, 58 P.3d at 137 ("Common law causes of action intended to regulate relationships among and between individuals are not adequate to redress the type of damage caused by the invasion of constitutional rights.").[14]

For example, a case involving pointless and even malicious strip searches of female inmates charged with misdemeanors at a jail by government authorities does not simply cry out for compensation of victims but demands an expression of community outrage and a measure of deterrence that can only be supplied by punitive damages. *See generally Ciraola v. City of New York*, 216 F.3d 236 (2d Cir. 2000) (reversing a district court award for punitive damages against a municipality but demonstrating the type of malicious strip search case where punitive damages should be available). Similarly, in many search and seizure cases, the main goal, as in the case of John Wilkes and other contemporaries, is not compensatory damages but rather reinforcement of the principle that government is not above the law and that the excesses of government will be dealt with in a fashion that deters future

---

[14]As noted by one scholar, "It is dangerous to define constitutional claims as a narrow subset of tort law because tort law has been particularly ineffective in dealing with precisely the sorts of interests and injuries that are at the center of constitutional law." Christina Brooks Whitman, *Emphasizing the Constitutional in Constitutional Torts*, 72 Chi.-Kent L. Rev. 661, 686 (1997).

misconduct. Recall Lord Pratt stating this "is worse than the Spanish inquisition." *Huckle*, 95 Eng. Rep. at 769.

Similarly, excessive force cases may involve large or small compensatory loss, but these cases involve much more than economic adjustment. Excessive force violations sufficient to give rise to direct constitutional violations[15] have dramatic public implications and involve examination of the role of police in its interactions with citizens and the confidence members of the community have—all members, that is—in law enforcement and government authorities. Brutal beatings or excessive force cases such as Rodney King, George Floyd, and Breonna Taylor are not just private matters to be adjusted through the transfer of funds to the victim. Does the case involve systemic blue on black violence, a mere one-off not likely to be repeated, or a reasonable effort by law enforcement in a difficult situation to protect the public? These questions are very public matters that involve important questions about the role of government, what government conduct is permissible, and how government conduct may be restrained and directed into legal channels. Excessive force cases involve not simply an allocation of loss, but a public "framing" of the transaction. Daryl J. Levinson, *Framing Transactions in Constitutional Law,* 111 Yale L.J. 1311, 1313–14 (2002).

**D. Doctrine of Sovereign Immunity Does Not Apply to Constitutional Causes of Action.** The above differences logically lead to the conclusion that the doctrine of sovereign immunity does not apply to constitutional causes of action. If it did, the legislature would have the power to abolish all monetary claims for constitutional torts by simply

---

[15]*See Tennessee v. Garner*, 471 U.S. 1, 7, 105 S. Ct. 1694, 1699 (1985) (stating that the use of deadly force may give rise to a constitutional violation under the Fourth Amendment).

declaring that it declines to waive sovereign immunity. In my view, the doctrine of sovereign immunity may apply to ordinary tort claims, where third parties seek recovery for statutory and common law claims that the legislature has the ability to create or destroy, but it does not apply to constitutional claims brought directly under the Iowa Constitution.

The nonapplicability of sovereign immunity to direct constitutional claims was well described by the North Carolina Supreme Court in *Corum v. University of North Carolina.* 413 S.E.2d 276, 291–93 (N.C. 1992). According to the *Corum* court,

> It would indeed be a fanciful gesture to say on the one hand that citizens have constitutional individual civil rights that are protected from encroachment actions by the State, while on the other hand saying that individuals whose constitutional rights have been violated by the State cannot sue because of the doctrine of sovereign immunity.

*Id.* at 291.

And, as noted by another appellate court: "Constitutional rights serve to restrict government conduct. These rights would never serve this purpose if the state could use governmental immunity to avoid constitutional restrictions." *Burdette v. State*, 421 N.W.2d 185, 187 (Mich. Ct. App. 1988); *see also Smith v. Dep't of Pub. Health*, 410 N.W.2d 749, 793–94 (Mich. 1987) (Boyle, J., concurring in part and dissenting in part) (stating sovereign immunity "lose[s] its vitality when faced with unconstitutional acts of the state"); *Colman v. Utah State Land Bd.*, 795 P.2d 622, 630–35 (Utah 1990) (holding government immunity does not apply where claimant alleges State or state employee violated constitutional rights); T. Hunter Jefferson, *Constitutional Wrongs and Common Law Principles: The Case for the Recognition of State Constitutional Tort Actions Against State Governments*, 50 Vand. L. Rev. 1525, 1543

(1997) ("Sovereign immunity must give way in the face of a constitutional tort claim.").

The bottom line is that the direct constitutional claim brought by plaintiffs in this case is not dependent upon a legislative waiver of sovereign immunity or a legislatively enacted remedial scheme. To the extent the majority implies otherwise, it is plainly incorrect.

**E. Individual Liability for Constitutional Claims.** All the folderol about "persons" and "official capacity" and "individual capacity" in cases brought under 42 U.S.C. § 1983 introduce statutory distinctions of no relevance in a direct constitutional tort. In Iowa, persons acting under color of law who deprive individuals of constitutional rights may be sued individually. The State may be liable for the acts of its officer, employee, or agent based upon the doctrine of respondeat superior. That is it. *See Ritchie v. Donnelly*, 597 A.2d 432, 446–47 (Md. 1991); *Clea*, 541 A.2d at 1312. There is no need to engage in the hair-splitting under 42 U.S.C. § 1983, where the distinction between official capacity suits and individual actions has been developed as a strategy to assess liability to the government even though the statute is limited to persons. In a direct constitutional claim, government officials are liable for actions they have taken under color of law, and the State may be liable under a respondeat superior theory.

**III. The Iowa Tort Claims Act Does Not Cover Direct Iowa Constitutional Causes of Action Based on Assault and Battery.**

The ITCA defines the term "claim" in Iowa Code section 669.2(3). While section 669.2(3) may be a gateway into the ITCA, there is an exit ramp in section 699.14. Iowa Code section 669.14(4) states that "[t]he provisions of this chapter shall not apply, with respect to any claim against the state, [for] . . . assault, [or] battery." Thus, while the direct

constitutional cause of action for excessive force might arguably come in the gateway of Iowa Code section 669.2(3) as a claim, it leaves the chapter through the exit ramp established by section 669.14(4). The claim is simply not within the scope of the chapter.[16] For those dedicated to textual interpretation, this should be the end of the matter. *Doe v. State*, 943 N.W.2d 608, 610 (Iowa 2020) (advocating textual approach to statutory interpretation).

Further, as the majority recognizes, any legislative regulation of direct Iowa constitutional claims must provide an adequate remedy for *constitutional* violations. The language of the ITCA does not do so in this case, as it contains a provision expressly excluding assault and battery from its scope. *See* Iowa Code § 669.14(4). If somehow the plaintiffs' direct constitutional claim passed through the gateway of Iowa Code section 669.2(3) but did not escape through the exit of section 669.14, the majority apparently reasons there would be a problem, and therefore, it seeks to sever the exit provision and hold the plaintiffs' claim as a hostage in the ITCA—eliminating the possibility of punitive damages from the claim.

But there is absolutely nothing illegal, on its face or as applied, about the exit provision of Iowa Code section 669.14(4) that the majority miraculously seeks to sever. The legislature utilized a broad gateway and then excluded a series of defined claims. There is nothing unlawful with that at all. The majority seeks to sever a highly unfavorable, and indeed dispositive, provision that, if honored, would remove the plaintiffs' claim from the ITCA. But the provision is perfectly lawful. There is no

---

[16]Nothing in Iowa Code section 669.21(1) is to the contrary. This section provides for indemnification of employees for claims "including claims arising under the Constitution . . . of any state." *Id.* But Iowa Code section 669.14(4) states that "[t]he provisions of this chapter shall not apply" to assault or battery. Therefore, Iowa Code section 669.21(1), as a provision of "this chapter," has no applicability to claims of assault and battery.

requirement that direct constitutional claims of excessive force be considered in the ITCA or not at all. Direct constitutional claims are self-executing.

The legislature has expressly declared that "[t]he provisions of this chapter shall not apply" to assault and battery. Iowa Code § 669.14(4). Through its attempt to sever the assault and battery exclusion, the majority amends the statute to include a claim that the legislature lawfully chose to *expressly exclude.*

Even the State does not try that! Instead, the State leaves the ITCA as it finds it and argues, among other things, that the plaintiffs may not bring their direct constitutional claims without an express waiver of sovereign immunity. But the State declines to invite this court to sever valid provisions of the ITCA. As a result, there is a question of whether the severance issue is properly preserved. *See Am. Meat Inst. v. Pridgeon,* 724 F.2d 45, 47 (6th Cir. 1984) (waiving on appeal the issue of severability of state law that was raised for the first time in a motion for reconsideration). This is particularly problematic, as the plaintiffs did not have an opportunity to brief the severance issue that has been imported into the case by the majority to achieve its desired result.

In any event, the severance doctrine has no application in this case. Severance is a tuck and trim operation, designed to eliminate offensive constitutional provisions and save the remainder from the unconstitutional taint. *Clark v. Miller,* 503 N.W.2d 422, 425 (Iowa 1993) ("We have an obligation to preserve as much of a statute as possible within constitutional restraints. We declare unconstitutional only that portion of the statutory section that violates constitutional provisions." (citation omitted)). In this case, severance is used not to cut and trim a cancerous provision but instead is used to extend the scope of the statute beyond the

express limitations of the legislature. This is an act the court simply cannot do.

The above principles were on display in *State v. Inland Empire Refineries, Inc.*, 101 P.2d 975, 982 (Wash. 1940) (en banc). In *Inland Empire*, the Supreme Court of Washington determined that certain exemptions from taxation were unconstitutional. *Id.* at 979. The question was whether the court could simply sever the exemptions from the statute. *Id.* at 981. According to the Supreme Court of Washington, such excision of exemptions

> would involve a complete reconstruction, indeed a re-creation, of the act, and would result in imputing to the Legislature an intention which the present wording of the act does not sustain. Such a process indulged in would not be judicial, but would be legislative, and would assume a power that we are not permitted to exercise.

*Id.* at 982; *see also State ex rel. Transp. Mfg. & Equip. Co. v. Bates*, 224 S.W.2d 996, 1001 (Mo. 1949) (en banc) ("The courts have no power by construction to extend the scope of a taxing statute and make it applicable to those to whom the General Assembly never intended it should apply, thus taxing those whom the Legislature said shall not be taxed."); *Pasado's Safe Haven v. State*, 259 P.3d 280, 286–87 (Wash Ct. App. 2011).

This court must accept the fact that the legislature has declared that assault and battery claims are not within the scope of the ITCA. The court should accept what the legislature has enacted. If the legislature desires to bring a tort claim within the scope of the ITCA, it will have to do so through appropriate legislation that provides an adequate remedy for any direct constitutional claim. But as demonstrated above, for the court to do so through application of the severance doctrine is judicial legislation.

As a back up to its severance analysis, the majority proposes that this court simply adopt the provisions of the ITCA onto our judicial gloss

of the development of the direct constitutional tort. I cannot agree. At the outset, the only questions we have been asked are whether certain provisions of the ITCA apply to this case. The majority's development on its own of a shadow ITCA is beyond the scope of the questions posted by the federal court. Whether the court should develop a shadow law has not been briefed by the parties and is beyond the scope of this litigation. [17]

Further, there is no authority for the proposition that a court recognizing a direct constitutional cause of action under its state constitution should judicially develop some kind of shadow tort claims act to surround constitutional torts when the relevant legislative version of the statute is inapplicable. More specifically, no state with direct constitutional torts has fashioned some kind of judicially created notice regime or imposed some limitation on punitive damages that looks like an inapplicable legislative restriction.

So I would not create some kind of shadow tort claims act when the actual tort claims act did not apply and where the issue is not raised in the litigation. Further, I would not adopt the one that the majority has fashioned. For example, I would not adopt a judicially created notice provision for constitutional torts. In *Felder v. Casey*, the United States Supreme Court considered whether a Wisconsin notice of claim provision in state law could be applied to a 42 U.S.C. § 1983 action where a suspect was allegedly exposed to excessive force. 487 U.S. 131, 134–38, 108 S. Ct. 2302, 2304–06 (1988). The *Felder* Court determined that applying a notice

---

[17]The district court only asks whether the terms of a specific statute, the ITCA, apply to this case. The answer to that question, as demonstrated above, is no. The district court does not ask whether the Iowa Supreme Court should judicially imply similar or identical terms if, in fact, the ITCA does not apply. And, there is nothing in the State's brief declaring that if the ITCA does not apply, the court should nevertheless as a matter of judicial construction imply such term identical to the ITCA in this case.

of claim provision would unduly burden the federal right. *Id.* at 141, 108 S. Ct. at 2308. As the *Felder* Court explained,

> A state law that conditions that right of recovery upon compliance with a rule designed to minimize governmental liability, and that directs injured persons to seek redress in the first instance from the very targets of the federal legislation, is inconsistent in both purpose and effect with the remedial objectives of the federal civil rights law.

*Id.* at 153, 108 S. Ct. at 2314. As the *Felder* Court points out, it is one thing to borrow a statute of limitations for use in a direct constitutional action but quite another to create a notice barrier to bringing a direct constitutional claim. *Id.* at 145–46, 108 S. Ct. at 2310–11. Of course, *Felder* involved a 42 U.S.C. § 1983 action, but its point applies equally well in the context of state constitutional torts. A notice provision adds an unnecessary burden to vindication of the constitutional claim.

Even if a notice of claim approach could be defended, I would certainly not adopt this new procedural wrinkle for the first time today and apply it to the case at hand in a fashion that sends the plaintiffs' claim out of court. Nor would I limit litigation to Iowa courts, and certainly not without giving interested parties a full opportunity to brief the pros and cons of such a move. And, as will be explained further below, I think it crystal clear that the preclusion of punitive damages in the ITCA does not pass constitutional muster in light of the special nature of constitutional torts. Punitive damages are an essential tool in the enforcement of direct constitutional causes of action. Michael Wells, *Punitive Damages for Constitutional Torts*, 56 La. L. Rev. 841, 841 (1996) [hereinafter Wells] ("[C]onstitutional tort is one area where punitive damage awards are essential to the effective enforcement of our rights.").

As a result of the above, I would conclude that the exclusion of assault and battery from the ITCA removes this case from the ITCA and

makes the remedial structure entirely inadequate to consider the direct constitutional claims in this case. Therefore, the provisions of the ITCA have no application to the plaintiffs' claims.

**IV.  Overview of the Law of Punitive Damages.**

**A.  Iowa Caselaw on Purpose of Punitive Damages.**  Before one starts to whittle away at remedies for direct constitutional torts, it is important to understand the substance of what is being cut away— namely, punitive damages. I begin with a brief survey of the law of punitive damages.

"Punitive damages are well-established under [Iowa law]." *Ackelson v. Manley Toy Direct, L.L.C.*, 832 N.W.2d 678, 686 (Iowa 2013); *see also Lacey v. Straughan*, 11 Iowa 258, 260 (1860). Punitive damages in Iowa are available if the plaintiff proves by a preponderance of clear, convincing, and satisfactory evidence the defendant's conduct constituted a willful and wanton disregard for the rights or safety of another and caused actual damage. Iowa Code § 668A.1(1)(*a*); *Beeman v. Manville Corp. Asbestos Disease Comp. Fund*, 496 N.W.2d 247, 255–56 (Iowa 1993) (en banc).

As we stated in *Ryan v. Arneson*, punitive damages have a different purpose than actual damages,

> Actual damages are designed to compensate the injured party for the injury caused by wrongful acts. Punitive damages, on the other hand, are not compensatory. They exist to punish the defendant and to deter the offending party and like-minded individuals from committing similar acts.

422 N.W.2d 491, 496 (Iowa 1988) (citation omitted); *see also Northrop v. Miles Homes, Inc. of Iowa*, 204 N.W.2d 850, 861 (Iowa 1973) ("Exemplary damages are in no way intended to be compensatory. . . . Exemplary damages are intended to punish the defendant and deter others from similar wrongdoing." (citation omitted)); *Syester*, 257 Iowa at 629, 133

N.W.2d at 676 ("[I]llegal or improper acts ought to be deterred by the exaction from the defendant of sums over and above the actual damage he has caused." (quoting *Amos*, 115 F. Supp. at 137)).

Our common law development of punitive damages fits nicely with the constitutional claims in the *Wilkes* canon. Punitive damages beyond actual damages were appropriate in *Wilkes* "to deter from any such proceeding for the future, and as a proof of the detestation of the jury to the action itself." 98 Eng. Rep. at 498–99.

We have also emphasized the fact-based nature of the punitive damages question. We have noted, for instance, that legal precedent is of marginal value in assessing a punitive damages award in an individual case. *Ryan*, 422 N.W.2d at 496; *Northrup*, 204 N.W.2d at 861.

The bottom line is that punitive damages have long been available in Iowa, they are designed primarily to deter and to express community outrage and not to compensate, and punitive damage claims are generally fact intensive and not subject to broad application of legal rules.

**B. Punitive Damages Are "Especially Appropriate" in Direct Constitutional Causes of Action.**

1. *Introduction.* My views on the role of punitive damages in direct Iowa constitutional causes of action have already been presented in *Godfrey II* and are briefly reprised and elaborated upon here in light of the specific context of this case. 898 N.W.2d at 876–79.

Punitive damages play a central role in the enforcement of direct constitutional causes of action. The pedigree is exceptional in light of the *Wilkes* cases where jury verdicts of punitive damages were upheld in the English courts as an expression of outrage over the government's behavior and as a deterrent to future violations. Consistent with the *Wilkes* cases, as noted by the Supreme Court of Louisiana,

"[T]he right of the people to be secure in their *persons*, houses, papers and *effects*, against unreasonable searches and *seizures . . . ,*" would be a mockery if courts . . . failed to inflict exemplary damages for the wanton abuse of the personal liberty and private rights of property . . . .

*Frazier v. Parsons*, 24 La. Ann. 339, 341 (1872) (quoting U.S. Const. amend. IV). So, constitutional torts are different, and that difference drives in the direction of permitting juries to impose punitive damages in appropriate cases.

2. Carlson v. Green*: punitive damages "especially appropriate" in direct constitutional claims.* In *Carlson v. Green,* the Supreme Court considered the question of whether the Federal Tort Claims Act (FTCA) provided an adequate remedy to direct constitutional claims in a case involving a wrongful death. 446 U.S. 14, 16–17, 100 S. Ct. 1468, 1470–71 (1980). Like the case at bar the direct constitutional claim was brought by a mother on behalf of her son's estate. *Id.* at 16, 100 S. Ct. at 1470. She alleged that her son died as a result of violations by federal prison officials of her son's due process, equal protection, and Eighth Amendment rights. *Id.* She sought damages for the violations. *Id.* The question was whether the FTCA provided an exclusive remedy or whether she could proceed outside the framework of the FTCA with her lawsuit. *Id.* at 16–17, 100 S. Ct. at 1470–71.

In *Carlson,* the Supreme Court declared that the FTCA remedy did not prevent the mother from pursuing an independent direct action. *Id.* at 18–19, 100 S. Ct. at 1471–72. The *Carlson* Court noted there was nothing in the FTCA that suggested that Congress intended to preempt the independent claim. *Id.* at 19–20, 100 S. Ct. at 1472. Like the ITCA the FTCA was enacted before *Bivens. Id.* But nothing in the FTCA expressly indicated an intent to cover *Bivens*-type claims. *Id.*

In addition, the *Carlson* Court noted that a *Bivens* claim gave rise to a claim against individuals. *Id.* at 24–25, 100 S. Ct. at 1475. The *Carlson* Court observed that the individual remedy available under *Bivens* was different from the remedy against the United States offered by the FTCA. *Id.* at 20–23, 100 S. Ct. at 1472–74. As a result, the *Bivens* claim provided an extra measure of deterrence. *Id.*

The *Carlson* Court also turned to the issue of punitive damages. *Id.* at 21–22, 100 S. Ct. at 1473. The *Carlson* Court noted that punitive damages were "especially appropriate to redress the violation by a government official of a citizen's constitutional rights." *Id.* at 22, 100 S. Ct. at 1473. As a result, the *Carlson* Court noted that the FTCA is "that much less effective" than an independent direct constitutional claim. *Id.*

The Supreme Court's conclusion in *Carlson* was unequivocal. According to the *Carlson* Court, "Plainly [the] FTCA is not a sufficient protector of the citizens' constitutional rights." *Id.* at 23, 100 S. Ct. at 1474. Although *Carlson* involved a number of factors, the lack of punitive damages under the FTCA clearly played a major role in the Court's assessment of the adequacy of the FTCA remedies.[18]

---

[18]Three years after *Carlson*, the Supreme Court upheld an award of punitive damages in a 42 U.S.C. § 1983 action against a prison guard where a prisoner was allegedly recklessly placed in a cell with other inmates where he was harassed, beat, and subject to sexual assault. *Smith v. Wade*, 461 U.S. 30, 52–56, 103 S. Ct. 1625, 1638–40 (1983). The Supreme Court affirmed a jury verdict awarding $25,000 in compensatory damages and $5000 in punitive damages. *Id.* at 33, 103 S. Ct. at 1628. The jury instruction in *Smith v. Wade* permitted an award of punitive damages for conduct involving reckless or callous indifference to Smith's federally protected rights. *Id.* In approving the jury instruction and affirming the verdict, the *Smith* Court noted that "society has an interest in deterring and punishing all intentional or reckless invasions of the rights of others." *Id.* at 54, 103 S. Ct. at 1639.

**V. Application of Bar on Punitive Damages in the ITCA to This Case.**

**A. Majority Approach to Punitive Damages in this Case**. In light of the well-established nature of punitive damages, the fact-based nature of the punitive damages inquiry, and the special role of punitive damages in constitutional torts, one would want to be very cautious with dismissing a claim of punitive damages based solely on the pleadings. No one claims that the pleadings in this case are not sufficient to support traditional punitive damages under ordinary Iowa law. The question is whether punitive damages can be taken off the table as a potential remedy for the case based solely on the pleadings.

That is what the majority does. It simply declares that "[a]t least in an excessive force case without other unconstitutional conduct where any actual damages will likely be significant, we are not persuaded to overturn the bar on punitive damages imposed by the legislature." Apparently an excessive force case, standing alone, is not enough for punitive damages where the beating is sufficiently severe to cause actual harm. On the pleadings, the majority guesses that it is "likely" that "substantial" actual damages will arise in this case involving the death of a young, mentally ill, and suicidal individual. Under the majority's approach, the greater the harm inflicted by the unconstitutional excessive force, the lesser the need for an award of punitive damages. There are no citations for that proposition. In any event, according to the majority, as a matter of law, there is a categorical bar to punitive damages in excessive force cases where (1) no "other" constitutional claims are present, and (2) "actual damages will likely be significant."

The majority further declared that in a "different kind of constitutional tort case," there might be a different answer. For example,

the majority suggests that in cases involving "invidious discrimination or suppression of free speech, a traditional award of actual damages may not" be sufficient.  But how do we know that these additional features are not at work in this case at the pleading stage?  We have only notice pleading. We do not know the race of the parties.  We do not know if, for example, discrimination against persons who are mentally ill was at work.  But, after today, the majority takes punitive damages off the table as a matter of law for cases involving solely the use of excessive force, *no matter how malicious or how brutal,* provided that the excessive force was "likely" to cause "significant" actual damages.  If the beating is mild and only embarrassing to the person being beaten, then punitive damages may be available, but after today, law enforcement can be advised that there will be no punitive damages in an excessive force case if they cause sufficient actual injury.

### B.  Problems with Majority Approach.

1.  *Punitive damages not available as a matter of law based on the pleadings.*  In this case, the majority determines based solely on the pleadings that punitive damages are categorically not available in an excessive force case, even where the pleadings are sufficient to raise the issue of punitive damages under traditional Iowa law.  But under Iowa law, a challenger to a pleading must show "no state of facts is conceivable under which the plaintiffs might show a right of recovery." *Below v. Skarr*, 569 N.W.2d 510, 511 (Iowa 1997).  But here, we have only notice pleading.  We do not have a developed factual record regarding the shooting.  It is certainly conceivable that there are many facts out there that might strongly support a claim of punitive damages. We do not have any factual information about Spece's motivation, whether Spece had any prior relationship with the deceased, whether Spece made any disparaging

comments at or around the time of the shooting. We do not know Spece's race or age. We cannot say, at this point, whether there was even discriminatory motivation based upon race, disability, or religion. But according to the majority, the plaintiffs are not allowed to develop the facts to support a possible punitive damages claim.

The majority, based on the pleading, declares that it is "likely" that "substantial" actual damages may be awarded. I do not think the principle that the greater the actual injury, the lesser the claim for punitive damages makes any sense. Setting aside the validity of this consideration on the availability of punitive damages, we really do not know the facts. We know little about the young man's mental health history, his employment history, and his life expectancy given his suicidal inclinations. Although I do not know what "substantial" actual loss means, it seems to me it is conceivable that the economic loss in this case would be relatively modest. And if the plaintiffs prove their case (namely that the shooting amounted to target practice), an award solely of economic damages would be entirely inadequate without an addition of punitive damages to deter future similar misconduct.

Further, note what facts are not relevant at all. In excessive force cases, for the majority, it does not matter whether the perpetrator is a recidivist, or how many blows are inflicted, or why they are inflicted, or how they are inflicted, or who is present when they are inflicted, or the amount of time or duration of the attack, provided that it is "likely" that the perpetrator has inflicted "actual damage" and there is no other constitutional violation present.

2. *The greater the actual harm, the less likelihood of punitive damages?* Under the majority's view as I see it, the greater the application of excessive force, the greater the likelihood of actual damages, and

therefore, the greater the likelihood that punitive damages are eliminated at the pleading stage as a matter of law without further inquiry. Torture causing serious injury is less likely to draw punitive damages, according to the majority's rule, than a slap. This strikes me as an upside down proposition.

But the facts do matter. If I were forced to pick a category of cases where facts do not matter for purposes of punitive damages in cases involving direct constitutional causes of action, one of the last categories I would select is excessive force cases where substantial damages have been inflicted on the hapless victim. An excessive force case is exactly the type of case where punitive damages may well be a critical element in achieving an appropriate measure of justice and where a jury, with the supervision of a judge, should make the key assessment of state behavior.

3. *The majority ignores the public interest purpose of constitutional torts.* As has been stressed above, one of the central pillars of a direct constitutional tort is to advance the public interest in constitutional enforcement and to deter future misconduct. *Wilkes*, 98 Eng. Rep. at 498–99. And, the purpose of punitive damages historically in Iowa has not been compensatory but designed to punish the defendant and to deter future misconduct. *Ryan*, 422 N.W.2d at 496. The majority conflates compensatory and punitive damages, noting that if there is a likelihood of "substantial" actual damages, there is no need for a punitive damages remedy. But that formulation ignores the fundamental difference in purpose of punitive damages as compared to compensatory damages. The majority gives no role for expression of public outrage or in deterring future misconduct of an excessive force case involving substantial actual damages that was so important in the glorious *Wilkes* case. The majority essentially *privatizes* the constitutional tort claim by focusing only on the

remedy of actual damages and ignoring the public interest in expressing outrage and in deterring unconstitutional official misconduct that has historically supported the punitive damages remedy.

4. *Many excessive force cases have awarded both actual damages and punitive damages in light of their different purpose.* There is little point in a long laundry list of citations, but suffice it to say that punitive damages have traditionally been very much a part of excessive force cases where the actual injury has been substantial. *See, e.g., Ismail v. Cohen*, 899 F.2d 183, 187 (2d Cir. 1990) (upholding $150,000 in punitive damages with $650,000 in compensatory damages); *Gutierrez-Rodriguez v. Cartagena*, 882 F.2d 553, 579–82 (1st Cir. 1989) (upholding punitive damage totaling $600,000 and compensatory damages of $4,500,000); *Bordanaro v. McLeod*, 871 F.2d 1151, 1153 & n.1 (1st Cir. 1989) (upholding total award of $3,488,356 in compensatory damages and $819,983 in punitive damages); *O'Neil v. Krzeminski*, 839 F.2d 9, 13–14 (2d Cir. 1988) (upholding $185,000 in punitive damages with compensatory damages of $80,000); *Stokes v. Delcambre*, 710 F.2d 1120, 1126–28 (5th Cir. 1983) (upholding punitive damages of $205,000 and $105,000 against sheriff and deputy with $70,000 in compensatory damages in a jail conditions case); *Alla v. Verkay*, 979 F. Supp. 2d 349, 372–79 (E.D.N.Y. 2013) (upholding $150,000 in punitive damages where the initial jury award for compensatory damages totaled $1,750,000 and would not be less than $250,000 after a new trial solely on economic damages); *Lewis v. City of Albany Police Dep't*, 547 F. Supp. 2d 191, 210 (N.D.N.Y. 2008) (upholding a jury award of $200,000 in punitive damages in an excessive force case with $65,000 in compensatory damages).

5. *The majority's requirement of a double constitutional violation to open the door for punitive damages is unprecedented and unworkable.* The

majority suggests that if a plaintiff has pled a double constitutional violation, then the multiple claims together might give rise to punitive damages. A substantial constitutional claim of excessive force resulting in death is, apparently, not sufficiently serious as a matter of law to prevent the elimination of a punitive damages remedy. Under the majority's approach, a brutal, brutal beating is not enough, even if the application of excessive force was by a repeat offender, continued over a long period of time, and brought the victim to the edge (or over the edge) of life. There has to be, as I read the majority opinion, a second constitutional violation, maybe "invidious discrimination." But an application of excessive force, no matter how outrageous, by an equal opportunity oppressor does not require the availability of a punitive damages remedy.

The majority's suggestion that invidious discrimination in addition to excessive force might increase the likelihood of availability of punitive damages for direct constitutional claims is not very comforting. Invidious discrimination, under federal caselaw at least, is a very narrow doctrine that requires proof of actual intent to discriminate, something that is almost impossible to prove. *See State v. Brown*, 930 N.W.2d 840, 918–19 (Iowa 2019) (Appel, J., dissenting).

I have found no case in any jurisdiction requiring two constitutional violations to support a claim of punitive damages in an excessive force case. Like the proposition that the presence of actual damages reduces the need for punitive damages, the proposition that two constitutional claims must be present to support punitive damages is an unprecedented barrier to vindication of a direct constitutional claim of excessive force.

6. *Application of* Godfrey II *principles to a case involving ultimate physical invasion resulting in death.* In *Godfrey II*, this court was divided

on the question of whether a punitive damage remedy was required to provide an adequate remedy for the alleged constitutional violations in that case. 898 N.W.2d at 880 (Cady, C.J., concurring in part and dissenting in part). An opinion by Chief Justice Cady provided the determinative vote on the question of whether the remedies provided by the Iowa Civil Rights Act (ICRA) were adequate to preempt Godfrey's direct constitutional claim on equal protection grounds. *Id.* Chief Justice Cady concluded that under the allegations made in the case involving loss of salary due to alleged discrimination based on sexual orientation, the remedies under the ICRA were adequate and, as a result, the district court properly dismissed Godfrey's direct constitutional claims based on sexual orientation discrimination. *Id.* at 881.

Chief Justice Cady recognized that in *Carlson*, the Supreme Court emphasized, without qualification, that punitive damages are "especially appropriate to redress the violation by a Government official of a citizen's constitutional rights." *Id.* (*quoting Carlson*, 446 U.S. at 22, 100 S. Ct. at 1473).

Chief Justice Cady did not reject *Carlson*, but he did limit it. In finding that the remedies under the ICRA were adequate notwithstanding *Carlson*'s declaration that they were "especially appropriate" in cases involving constitutional rights, Chief Justice Cady emphasized several factors. Chief Justice Cady noted that Godfrey claimed a reduction of salary that could be adequately compensated by damage remedies under the ICRA. *Id.*

Further, Chief Justice Cady noted that under the ICRA, a plaintiff could recover attorney fees. He emphasized that

> *[o]bviously, attorney fees cannot replace punitive damages in cases of physical invasion, assault, or violations of other liberty interests,* but their availability for a claim of monetary loss is

an important factor in assessing the adequacy of a statutory remedy.

*Id.* (emphasis added). So there are two critical factors in Chief Justice Cady's analysis: one, the case did not involve "physical invasion, assault, or violations of liberty interests," and two, the additional remedy of statutory attorney fees are available. *Id.*

Here, of course, the case does involve the *ultimate physical invasion*—an assault and battery that results in death. And, there is no provision for attorney fees under the ITCA that might be balanced against the loss of a claim for punitive damages. Thus, the central underpinnings of Chief Justice Cady's opinion in *Godfrey II*—finding that the ICRA provided adequate remedies notwithstanding the lack of a punitive damages remedy—are simply not present.

Applying the principles of Chief Justice Cady's decisive *Godfrey II* opinion to this case involving the ultimate physical invasion, coupled with the lack of a compensating attorney fees provision, the remedies in this case provided by the ITCA would be inadequate under *Carlson*.

7. *Ironic reliance on* Baldwin II *and* City of Newport. The majority relies heavily on the holding in *Baldwin v. City of Estherville* (*Baldwin II*) that a municipality is not subject to punitive damages. 929 N.W.2d 691, 699–700 (Iowa 2019). That holding was based, in part, on the Supreme Court's holding in *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 271, 101 S. Ct. 2768, 2762 (1981). In *City of Newport*, the Supreme Court largely precluded an award of punitive damages against municipalities in actions under § 1983. *Id.*

In *City of Newport*, the Supreme Court emphasized that with respect to common law claims, the authorities were "virtually unanimous" in denying punitive damages against municipalities. *Id.* at 260, 101 S. Ct. at

2756. The *City of Newport* Court emphasized that at common law, punitive damages applied only to "actual wrongdoers." *Id.* at 263, 101 S. Ct. at 2757. The Court noted that "the retributive purpose is not significantly advanced, if it is advanced at all, by exposing municipalities to punitive damages." *Id.* at 268, 101 S. Ct. at 2760. The Supreme Court feared that juries could not be trusted with punitive damages in light of the temptations to produce large verdicts that threatened the financial integrity of the government entities in light of the unlimited taxing power of municipalities. *Id.* at 270–71, 101 S. Ct. at 2761–62. *See generally* Wells, 56 La. L. Rev. at 844–45.

But *City of Newport* should not be followed in this case. First, the approach in the case is wrong. While the Supreme Court feared excessive verdicts against municipalities, it overlooked the power of the courts to review a jury's award of punitive damages for excessiveness. *See, e.g., Auster Oil & Gas, Inc. v. Stream*, 835 F.2d 597, 603–04 (5th Cir. 1988). Further, the notion that cities will not be deterred by potential exposure to punitive damage awards seems unsupportable. Municipal entities are in a better position than individuals to develop oversight and training programs designed to limit the risk of punitive damages. Finally, punitive damage awards vindicate systematic values of compliance to basic constitutional principles by units of government. The gravity of the harm to the constitutional regime "is often not adequately measured by the personal damages [that a] victim can prove." Wells, 56 La. L. Rev. at 863.

But second, and more importantly, *City of Newport* involved the question of whether punitive damages should be awarded against a *municipality*. It did not involve punitive damages against *an individual*. As the Supreme Court itself recognized, much of the rationale against punitive damages against the City of Newport loses its steam in the context

of a claim against an individual. *City of Newport*, 453 U.S. at 269–70, 101 S. Ct. at 2761. Unlike claims of punitive damages against municipalities, punitive damages against individuals have broad support in the common law. *See, e.g.*, *Smith v. Wade*, 461 U.S. 30, 35, 103 S. Ct. 1625, 1629 (1983). Further, in response to claims that elimination of punitive damages against municipalities would undercut the deterrence function of constitutional torts, the Supreme Court noted that "a more effective means of deterrence" may be found in "juries and courts [who may] assess punitive damages in appropriate circumstances against the offending official, based on his personal financial resources." *City of Newport*, 453 U.S. at 269, 101 S. Ct. at 2761. Thus, one of the policy rationales for limiting punitive damages against municipalities was the availability of punitive damages against individual officers.

It would be ironic indeed to use a rule of law limiting punitive damages against municipalities based upon the availability of other remedies to eliminate the other remedies upon which the rule of law was based. Indeed, logic cuts in the other direction. As noted in *Newell v. City of Elgin*, the lack of exemplary damages against a municipality in a statutory scheme is a factor in permitting a *Bivens* claim. 340 N.E.2d 344, 349 (Ill. App. Ct. 1976).

**C. Summary.** In my view, in a case involving excessive force by government authorities alleging intentional misconduct or reckless disregard of the rights or safety of another, a punitive damages remedy must be part of the remedial portfolio. And the remedial scheme of the ITCA cannot be applied in this case. Along with the assault and battery exclusion, the lack of availability of a punitive damages remedy makes the remedial scheme of the ITCA an inadequate vehicle for consideration of excessive force cases. If there is to be severance of an unconstitutional

provision in this case, it is the unlawful exclusion of punitive damages by the ITCA for constitutional claims such as this one that should be severed, not the lawful exclusion of assault and battery claims. Instead, the majority has dramatically departed from the *Wilkes* tradition, one of the great gifts of English law, a gift that so moved earlier generations of Americans and Iowans, and replaced it with a more anemic remedial scheme for constitutional claims. I protest in the strongest of terms.

**IV. Conclusion.**

In light of the above analysis, I would answer the questions posed by the district court as follows:

"[Question 1:] Does the Iowa Tort Claims Act, Iowa Code Chapter 669, apply to plaintiffs' constitutional tort causes of     action?"
Answer: No.

"[Question 2:] Is the available remedy under the Iowa Tort Claims Act for excessive force by a law enforcement officer inadequate based on the unavailability of punitive damage? And if not, what considerations should courts address in determining whether legislative remedies for excessive force are adequate?" Answer: The limitations of the ITCA do not apply in this case. In an excessive force case, the plaintiff must have an adequate opportunity to seek punitive damages under standards for punitive damages previously developed at common law.

"[Question 3:] Are plaintiffs' claims under the Iowa Constitution subject to the administrative exhaustion requirement in Iowa Code section 669.5(1)?" Answer: No.

"[Question 4:] Are plaintiffs required to bring their Iowa constitutional claims in the appropriate Iowa district court under Iowa Code section 669.4?" Answer: No.